OPTIVISION, INC., Plaintiff,

v.

SYRACUSE SHOPPING CENTER ASSO-
CIATES, a Limited Partnership, Inter-
national Business & Realty Corporation,
Irving H. Rosenberg, and DeWitt's Opti-
cal World, Inc., Defendants.

No. 79–CV–33.

United States District Court,
N. D. New York.

May 31, 1979.

Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N. Y., for plaintiff; Paul M. Hanrahan, M. Harold Dwyer, Syracuse, N. Y., of counsel.

Gross, Shuman, Brizdle, Laub & Gilfillan, P.C., Buffalo, N. Y., for defendants Syracuse Shopping Center Associates, International Business & Realty Corp. and Irving H. Rosenberg; Philip B. Abramowitz, Buffalo, N. Y., of counsel.

Vecchio & Clark, North Syracuse, N. Y., for defendant DeWitt's Optical World, Inc.; Howard F. G. Clark, Jr., North Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

On January 15, 1974, Optivision, Inc., which operates a wholesale and retail optical goods business, entered into a lease agreement with Syracuse Shopping Center Associates ("Syracuse Associates") to rent a small commercial unit within the Northern Lights Shopping Center for use as a retail store for the dispensing of eyeglasses, contact lenses, and other optical devices. The lease was for five years, commencing on March 1, 1974 and ending on February 28, 1979. A rider to the lease gave the tenant the option to extend the term for an additional five-year period at a slightly increased rental, and provided that the tenant must give the landlord notice of his exercise of the option at least six months prior to the expiration date of the original term. The lease required such notice to be delivered in person or sent by certified mail to Syracuse Shopping Center Associates at 17 Court Street, Buffalo, New York. There is disagreement among the parties as to whether Optivision validly exercised this renewal option.

On September 6, 1978, the landlord leased a different commercial unit in the Northern Lights Shopping Center to a competitor of Optivision, DeWitt's Optical World, Inc. ("DeWitt"), for use as a retail optical goods store. The lease agreement with DeWitt contains an exclusivity clause, providing that the landlord will not rent space in the shopping center to any other optical store unless the center is expanded to include a third department store.

In this action, Optivision challenges the validity of the exclusivity clause in DeWitt's lease under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and under the New York State Donnelly Act. New York General Business Law § 340. Optivision also asserts that, under the legal or equitable principles applied by the New York courts, the lease should be regarded as having been properly renewed, and further alleges that defendants have tortiously interfered with plaintiff's contractual relations. Optivision seeks declaratory and injunctive relief as well as damages.

Presently before the Court is Optivision's motion for a preliminary injunction to restrain defendants from taking any action to enforce the exclusivity clause contained in the lease between the landlord and DeWitt and to restrain defendants from taking any action to remove plaintiff from its present Northern Lights location, pending a determination on the merits of this lawsuit. An evidentiary hearing was held before the Court on March 27 and 28, 1979. At that time, four witnesses testified: John Ransom, Chairman of the Board of Optivision; John Carter, New York State Regional Manager for Optivision; Irving Rosenberg, President of International Business & Realty Corporation ("International") and the leasing and managing agent for Northern Lights; and Morris DeWitt, President and principal shareholder of DeWitt's Optical World, Inc. Certain documentary proof was received in evidence during the hearing.

It is well established in this circuit that a party seeking a preliminary injunction must make a clear showing of either

(1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Selchow & Righter Co. v. McGraw-Hill Book Co.,* 580 F.2d 25, 27 (2d Cir. 1978); *State of New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 750 (2d Cir. 1977); *Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 n. 2 (2d Cir. 1977); *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973).

I.

A.

Initially, defendants argue that plaintiff does not have standing to maintain the antitrust claims since there is not a suffi-

cient causal relationship between the harm to Optivision and defendants' alleged anticompetitive conduct. Defendants argue that the damage suffered by Optivision is a direct and proximate result of its own ineptitude in failing to properly exercise the renewal option in its lease rather than the result of any combination or conspiracy among the defendants.

■ The right of a private litigant to injunctive relief in an antitrust action is governed by § 16 of the Clayton Act, 15 U.S.C. § 26,[1] which states in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . .

See also *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 360 (2d Cir. 1974). The standing requirement of § 16 is less restrictive than that contained in § 4 since the right to sue under the former provision extends to threatened as well as actual injuries, and is not limited to injuries to a party's "business or property." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260–62, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *DeGregorio v. Segal*, 443 F.Supp. 1257, 1265 n. 13 (E.D.Pa.1978); 15 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* § 114.-01[1] (1978).

However, as in a suit for treble damages under § 4, a party seeking injunctive relief under § 16 must demonstrate that the injury he has suffered (or is threatened with) proximately results from the antitrust violation. *Credit Bureau Reports, Inc. v. Re-*

*tail Credit Co.*, 476 F.2d 989, 992 (5th Cir. 1973); *Burkhead v. Phillips Petroleum Co.*, 308 F.Supp. 120, 123 (N.D.Cal.1970). Thus, "[t]here must be a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a 'material cause' of or a 'substantial factor' in the occurrence of damage." *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1255 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

■ On the basis of the present record in this case, the Court concludes that there is a sufficient causal relationship between the harm plaintiff is threatened with and the alleged anticompetitive conduct. While Optivision may not have validly exercised its renewal option, there is a substantial possibility that it would have been able to enter into a new lease agreement with the landlord at an increased rental if the exclusivity clause had not been granted to DeWitt. The nexus between the threatened harm and the activity in question can be seen from the letter sent by the landlord's counsel to the attorney for Optivision in which it is stated that Syracuse Associates have made "lease commitments which preclude their further interest in . . . [Optivision's] staying at Northern Lights." Defendants correctly point out that if Optivision has not properly renewed its lease, it will be in the same position with respect to the enforcement of the exclusivity clause as any other optical goods store in the Syracuse area, but the Court feels that such a party does have standing to seek injunctive relief, provided that there is space available in the shopping center which the landlord refuses to rent because of the exclusivity clause. See *Pay Less Drug Stores North-*

---

1. Section 16 of the Clayton Act, 15 U.S.C. § 26, is not specifically cited in the Complaint, but leave to amend the Complaint to include this statutory provision as a jurisdictional basis could be granted. Rule 15(a), Fed.R.Civ.P., provides that leave to amend "shall be freely given when justice so requires."

*west, Inc. v. City Products Corp.,* 1975–2 Trade Cases ¶ 60,385 (D.Ore.1975).[2]

Thus, plaintiff has shown a probability of successfully demonstrating that it has standing to maintain this suit.

### B.

Defendants also contend that the federal antitrust claims must be rejected, because plaintiff has failed to satisfy the interstate commerce requirement of the Sherman Act. That Act prohibits every contract, combination, or conspiracy "in restraint of trade or commerce among the several States," 15 U.S.C. § 1, and also outlaws any monopolization of, attempt to monopolize, or combination or conspiracy to monopolize a "part of the trade or commerce among the several States." 15 U.S.C. § 2.

■ The interstate commerce requirement of the Sherman Act will be established if the plaintiff is able to demonstrate either that the alleged anticompetitive conduct occurred in the flow of interstate commerce or that the activity in question, although occurring on a local or state level, has a substantial effect upon interstate commerce. *Burke v. Ford,* 389 U.S. 320, 321, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); *Tiger Trash v. Browning-Ferris Industries, Inc.,* 560 F.2d 818, 825 (7th Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc.,* 539 F.2d 907, 909 (2d Cir. 1976); *United States v. Greater Syracuse Board of Realtors, Inc.,* 449 F.Supp. 887, 891 (N.D.N.Y. 1978).

The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.

*United States v. Women's Sportswear Manufacturers Association,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

The substantiality of the effect under the affecting commerce theory must be viewed in terms of practical economics. *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 784 n. 11, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 51 (3d Cir. 1973); *Rasmussen v. American Dairy Association,* 472 F.2d 517, 523 (9th Cir. 1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973). In making this determination, the court must consider whether there is a sufficient nexus between the complained of conduct and the interstate commerce involved and whether the volume or amount of commerce so affected is substantial. *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Harold Friedman Inc. v. Thorofare Markets Inc.,* 587 F.2d 127, 132 (3d Cir. 1978); *United States v. Greater Syracuse Board of Realtors, Inc., supra,* 449 F.Supp. at 891, 897; *Joe Westbrook, Inc. v. Chrysler Corp.,* 419 F.Supp. 824, 837 (N.D. Ga.1976).

Testimony concerning the contacts between Optivision's Northern Lights store and interstate commerce was received at the hearing held in this case. In the Court's opinion, the most significant of those contacts is the purchase of products from out-of-state suppliers for resale in the Northern Lights retail outlet. Both Mr. Ransom and Mr. Carter listed several Optivision suppliers which were located in other states, but the record does not contain the precise figure representing the volume

---

**2.** The Court believes that, for similar reasons, the causation requirement under New ˜York State antitrust law is also satisfied in this case. The decision in *Mobil Oil Corp. v. Rubenfeld,* 48 A.D.2d 428, 370 N.Y.S.2d 943 (2d Dept. 1975), *aff'd,* 40 N.Y.2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976) is not to the contrary since the court in that case did not find that there was an insufficient causal relationship between the landlord's antitrust violations and the tenant's eviction, but rather found that the recognition, in those circumstances, of a retaliatory defense would impose a disproportionate penalty upon the landlord whereas monetary damages would adequately effectuate the purpose of the antitrust laws.

of products sent from outside the state to the Northern Lights store. Mr. Ransom stated that the projected gross retail sales for the Northern Lights store for the year 1979 is $200,000, and said that approximately 40% of the gross retail sales figure is represented by the wholesale cost of the products delivered to that store for resale (which would make the wholesale cost in 1979 $80,000). It is unclear exactly what portion of the $80,000 wholesale cost reflects the purchase of goods from out-of-state suppliers, but it is reasonable to infer from the testimony that a significant portion of the $80,000 figure represents the purchase of out-of-state products since Mr. Ransom stated that Optivision's largest supplier of optical lenses, from which it purchases the great bulk of its lenses, is located in Philadelphia, Pennsylvania, and lenses constitute one of the two principal items bought from wholesalers (the other principal item being frames).[3]

The Optivision representatives also testified that, while the vast majority of customers going to the Northern Lights store were from the Greater Syracuse Metropolitan Area, a small percentage (perhaps 1 or 2% according to Mr. Carter) came from other states.[4] In this regard, it was noted that customers of other Optivision stores are given guarantees that will be honored at the Northern Lights retail outlet, and that the Northern Lights Shopping Center is located near several interstate highways.

There was also testimony that materials are sometimes transferred between the Northern Lights store and Optivision stores located outside New York State. Optivision has six stores in Georgia in addition to

twelve in New York State. Optivision is also affiliated, under a concept known as Vision World, with stores located in Maryland and the Washington, D. C. area. The stores associated with Vision World engage in joint purchasing and promotional programs.

The alleged anticompetitive conduct here—the enforcement of the exclusivity clause in DeWitt's lease—will result in a cessation of the interstate movement of supplies and customers to the Northern Lights store operated by Optivision. This will cause a reduction in the total amount of commerce moving between the states or, at least, will cause the diversion of such commerce from Optivision's Northern Lights store to DeWitt's store situated in that shopping center or to retail optical outlets located elsewhere. In either event, there would be the required nexus between the acts in question and the interstate commerce involved. See *Harold Friedman Inc. v. Thorofare Markets Inc., supra*, 587 F.2d at 132; *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1142–43 n. 1 (2d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975).[5]

While it is not clear from the present record what the exact amount of interstate commerce implicated here is, it appears that a substantial portion of the $80,000 worth of supplies purchased annually by the Northern Lights store comes from companies situated in other states. This factor, either alone, or in combination with the sale of goods to out-of-state customers, the transfer of materials between stores in

---

3. Mr. Ransom also said that the proportion of out-of-state as opposed to in-state products purchased for the Northern Lights store was probably about the same as that purchased for the other Optivision retail outlets.

4. Testimony was received at the hearing showing that Optivision accepts credit cards from customers, but the Court does not have to consider what significance this might have in establishing the required nexus with interstate commerce, because the witness, who was asked this question, was unable to state where the credit card payments came from.

5. While there is a sufficient nexus between the complained of conduct and the interstate commerce engaged in by the Northern Lights store, there would not be an adequate nexus between the activities in question and the other seventeen retail stores owned and operated by Optivision, at least in the absence of proof that Optivision will be driven out of business by the defendants' actions. There is no evidence that Optivision as a corporate entity will be so affected.

different states, and other factors that may be demonstrated at a trial on the merits,[6] may quite possibly be sufficient to show that interstate commerce has been substantially affected. In *Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530, 539–41 (5th Cir. 1978), the Fifth Circuit found that there was a substantial effect upon interstate commerce so as to establish Sherman Act jurisdiction where the principal connections with interstate commerce were the plaintiff's purchases of $4,000 or $5,000 worth of out-of-state supplies a year, and the plaintiff's receipt of $12,000 worth of business a year from out-of-state patients.[7] Also, in a civil rights case—*Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964)—the Supreme Court found a sufficient effect upon commerce so as to bring a restaurant within the purview of Congressional supervision under the Commerce Clause, where the restaurant purchased $70,000 worth of meat from a local supplier who had procured it from outside the state. The latter case, while not decided under the Sherman Act, is relevant here, because it has repeatedly been held that, in passing the Sherman Act, Congress intended to exercise the fullest extent of its constitutional power to regulate commerce. See, e.g., *United States v. American Building Maintenance Industries*, 422 U.S. 271, 278, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975); *United States v. Frankfort Distilleries, Inc.*, 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951 (1945); *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 558, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

While the present record has certain deficiencies, the Court believes that it is likely that the plaintiff will be able to successfully demonstrate, at a trial on the merits, that the complained of conduct substantially affects interstate commerce.[8]

### C.

Optivision contends that exclusivity clauses in shopping center leases should be treated as *per se* unlawful under § 1 of the Sherman Act, and, in the alternative, argues that if the Court decides to apply a rule of reason analysis, the exclusivity clause in DeWitt's lease should be found to be unreasonable in the circumstances of this case.

Section 1 of the Sherman Act proscribes all agreements "in restraint of trade." If this provision were to be read literally, all commercial contracts would be regarded as violative of the Act since every agreement binds the contracting parties to its terms, and, accordingly, restrains their commercial dealings to a certain extent. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Recognizing that it was not Congress' intention to prohibit all contracts nor even all contracts that cause an insignificant or attenuated restraint of trade, the Supreme Court adopted the rule of reason as the standard of analysis for scrutinizing most business relations under the Sherman Act. *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Under this rule, all the circumstances presented by a particular case must be evaluated by the trier of fact to determine whether the complained of conduct imposes an unreasonable re-

---

**6.** The purchases which DeWitt makes from out-of-state suppliers could also be considered in determining the substantiality of the effect which the complained of conduct has upon interstate commerce, see *Harold Friedman Inc. v. Thorofare Markets Inc.*, supra, 587 F.2d at 132–33, but no proof in this regard was introduced at the hearing.

**7.** The interstate connections in *Mohammad* also included very limited payments received from out-of-state insurance companies and relatively small amounts spent on interstate travel by the plaintiff's officers or employees.

**8.** Since the Court believes that it is likely that the plaintiff will be able to prevail on the "affecting commerce" theory, it is unnecessary to consider the "in commerce" theory.

straint on competition. *Continental T. V., Inc. v. GTE Sylvania Inc., supra* 433 U.S. at 49, 97 S.Ct. 2549; *White Motor Co. v. United States,* 372 U.S. 253, 261, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 213 (S.D.N.Y.1978).

In making this inquiry, consideration must be given to "the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *United States v. Topco Associates, Inc., supra,* 405 U.S. at 607, 92 S.Ct. at 1133. See *Chicago Board of Trade v. United States, supra,* 246 U.S. at 238, 38 S.Ct. 242; *National Auto Brokers Corp. v. General Motors Corp.,* 572 F.2d 953, 960 (2d Cir. 1978). The focus of the analysis must be upon the impact of the challenged activity on competitive conditions in the relevant market. *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 688–92, 98 S.Ct. 1355; *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1247 (3d Cir. 1975). Any benefits to competition are to be weighed against the competitive evils of the practice in question. *Gough v. Rossmoor Corp.,* 585 F.2d 381, 388–89 (9th Cir. 1978).

While the rule of reason is used to evaluate the validity of most activity challenged under the Sherman Act, the doctrine of *per se* illegality has been applied to certain conduct that is manifestly anticompetitive. Thus, in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), the Supreme Court stated,

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

See also *Continental T. V., Inc. v. GTE Sylvania Inc., supra,* 433 U.S. at 50, 97 S.Ct. 2549; *United States v. Topco Associates, Inc., supra,* 405 U.S. at 607, 92 S.Ct. 1126. Courts have been willing to classify specific types of business relationships as *per se* violations only after having had considerable experience in evaluating them. *Broadcast Music, Inc. v. CBS, Inc.,* —— U.S. ——, ——, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *White Motor Co. v. United States, supra,* 372 U.S. at 263, 83 S.Ct. 696; *Evans v. S.S. Kresge Co.,* 544 F.2d 1184, 1191 (3d Cir. 1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). Examples of activity held to be *per se* unlawful include price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), group boycotts, *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and horizontal divisions of markets. *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

The Court believes that this is not an appropriate case to apply a *per se* rule. There has not been extensive judicial experience with exclusivity clauses in shopping center leases. There have been only a limited number of reported opinions dealing with such clauses. Most of those opinions involve rulings on preliminary motions, and do not contain a detailed economic evaluation of this type of activity. See *Harold Friedman Inc. v. Thorofare Markets Inc., supra,* 587 F.2d at 141 & n. 56. Moreover, while the Federal Trade Commission, see, e. g., *Tysons Corner Regional Shopping Center,* 85 F.T.C. 987, 1973–76 FTC Complaints & Orders ¶ 20,933 (1975); *Gimbels Brothers, Inc.,* 1973–76 FTC Complaints & Orders ¶ 20,478 (1974), and at least one commentator, Note, *The Antitrust Implications of Re-*

strictive Covenants in Shopping Center Leases, 86 Harv.L.Rev. 1201 (1973), have taken the position that restrictive covenants in shopping center leases should be subject to the per se doctrine, all courts considering this matter have indicated that a rule of reason approach should be applied. Harold Friedman Inc. v. Thorofare Markets Inc., supra; Borman's, Inc. v. Great Scott Super Markets, Inc., 433 F.Supp. 343 (E.D.Mich. 1975); Dart Drug Corp. v. Peoples Drug Stores, Inc., 1977–1 Trade Cases ¶ 61,281 (D.D.C.1977); Pay Less Drug Stores Northwest, Inc. v. City Products Corp., supra. See also Savon Gas Stations No. 6, Inc. v. Shell Oil Co., 309 F.2d 306 (4th Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963); Dalmo Sales Co. v. Tysons Corner Regional Shopping Center, 308 F.Supp. 988, 995 (D.D.C.), aff'd, 139 U.S. .App.D.C. 22, 429 F.2d 206 (1970).

The Court rejects plaintiff's suggestion that exclusivity clauses should be treated as veiled attempts at price fixing.[9] A price fixing agreement is "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity." United States v. Socony-Vacuum, supra, 310 U.S. at 223, 60 S.Ct. at 844. See also United States v. Parke, Davis & Co., 362 U.S. 29, 47, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); United States v. Nu-Phonics, Inc., 433 F.Supp. 1006, 1011 (E.D.Mich.1977). The per se rule will be applied even if the effect upon prices is indirect. United States v. General Motors Corp., 384 U.S. 127, 147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Simpson v. Union Oil Co., 377 U.S. 13, 16–22, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). However, not all arrangements that have an impact on prices are per se unlawful as price fixing combinations. Broadcast

Music, Inc. v. CBS, Inc., supra, —— U.S. at ——, 99 S.Ct. 1551; L. Sullivan, Antitrust § 73 (1977). Here there is no indication that the purpose of the complained of conduct was to fix prices, and any effect, which this activity might have upon prices, will be merely incidental, and will depend upon the market power of DeWitt. Therefore, the Court is of the opinion that it would be inappropriate to treat an exclusivity clause as a per se unlawful price fixing arrangement.

Moreover, the Court is unable to conclude that exclusivity clauses in shopping center leases are unreasonable in all possible circumstances. The competitive impact of such arrangements may vary considerably depending upon the availability of suitable alternate locations in the relevant market, and upon the strength of the remaining competition. In addition, there is a possible economic justification for a provision of this nature. In some situations, it may be necessary to include such a clause in a shopping center lease in order to attract to the center a certain type of store which might be unwilling to commit itself to a lease with high rentals if it knows that a competing store will be present in the center.

Also, the impact upon competitive conditions may differ depending upon the type of exclusivity clause involved. A provision that is to be enforceable for a set period of time or one that is to remain in effect until the shopping center expands (i. e., until an additional department store is added) does not necessarily have as great an effect upon competition as one not so limited in duration. Thus, the Court concludes that the validity of the exclusivity clause in DeWitt's lease with the landlord must be determined under the rule of reason rather than under a per se approach.[10]

---

**9.** In support of its argument that exclusivity clauses are, in essence, sophisticated attempts at price fixing, plaintiff relies upon State of Ohio ex rel. Brown v. Zayre of Ohio, Inc., 1974–2 Trade Cases ¶ 75,232 (Ohio Ct.Comm. Pl.Cuyahoga Co.1974). This Court notes that while the decision in Zayre discussed federal precedents, it was actually based upon state antitrust law.

**10.** An exclusivity clause in a shopping center lease is similar, in many respects, to an exclusive dealing arrangement between a manufacturer and a distributor since in both situations "a business entity in control of a product restrictively selects the parties to whom it will sell the commodity." Harold Friedman Inc. v. Thorofare Markets Inc., supra, 587 F.2d at 142. See also Borman's, Inc. v. Great Scott Super

It appears that the relevant product market in which the alleged anticompetitive conduct must be examined involves the retail sale of eyeglasses, contact lenses, and other optical devices along with the customer services pertaining thereto. However, there is disagreement among the parties concerning the relevant geographic market. Defendants contend that the geographic market is the Greater Syracuse Metropolitan Area while plaintiff argues that the relevant market is the vicinity of the Northern Lights Mall or the North Syracuse area. The geographic market, which is the area of effective competition, must correspond to commercial realities. *Brown Shoe Co. v. United States,* 370 U.S. 294, 336, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). It has been characterized as the area "in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). See also *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., supra,* 510 F.2d at 1144 n. 2; L. Sullivan, *supra,* § 19. While the relevant geographic market is often the nation, it can, in an appropriate case, be as small as a city or even part of a city. *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (City of Lorain), *William Goldman Theatres, Inc. v. Loew's, Inc.,* 150 F.2d 738 (3d Cir. 1945) (Central theatre district of Philadelphia).

The Court concludes, on the basis of the present record, that the relevant geographic market is the northern part of the Greater Syracuse Metropolitan Area. This conclusion is supported by the testimony of Mr. Carter, Mr. Rosenberg, and Mr. DeWitt. Mr. Carter described the North Syracuse-Mattydale-Liverpool region as being the primary marketing area of the Northern Lights store; Mr. DeWitt characterized the same general vicinity as the drawing area for Northern Lights; and Mr. Rosenberg indicated that commercial properties in that area are in competition with Northern Lights for tenants.

The record now before the Court reveals that there are numerous commercial properties in the relevant geographic market which are suitable as alternate locations for a retail optical store. Several such properties were listed by Mr. Rosenberg in his testimony given at the hearing. The availability of such market alternatives is an important factor that supports a determination that the exclusivity clause here does not unreasonably restrain competition. See *Borman's, Inc. v. Great Scott Super Markets, Inc., supra,* 433 F.Supp. at 351. See also *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.,* 459 F.2d 138 (6th Cir. 1972). It is significant that in the only case in which an exclusivity clause in a shopping center lease was invalidated—*Pay Less Drug Stores Northwest, Inc. v. City Products Corp., supra*—the court found that alternate sites in the area were unavailable, and that a site within the shopping center in question was the only place from which the plaintiff could effectively compete in the market. This is not the case here.

Optivision contends that the restraint in question is an unreasonable one since the Northern Lights Shopping Center, from which plaintiff is being excluded, is an enclosed regional mall while the other commercial properties in the area (with the exception of Penn Can Mall where DeWitt already has a retail optical store) are strip shopping centers or plazas. However, there is not an adequate basis for the Court to compare accurately the alternate locations in question. While certain very basic information concerning the Northern Lights Shopping Center was received in evidence, there is no indication in the record of the size or configuration of the various strip

*Markets, Inc., supra,* 433 F.Supp. at 351. Exclusive distributorships between manufacturers and sellers have generally been upheld by the courts under the rule of reason. *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir. 1978); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Bay City-Abrahams Bros., Inc. v. Estee Lauder, Inc.,* 375 F.Supp. 1206 (S.D.N.Y.1974).

centers or plazas in the relevant market area. Also, plaintiff has offered no proof concerning the amount of traffic passing by the Northern Lights regional mall in comparison to that passing by the strip centers and plazas or the amount of business which an optical store located in one of these strip centers or plazas has been able to generate in comparison to the amount of business done by a retail optical outlet located in Northern Lights. The only evidence in the record on this question is adverse to the plaintiff. Mr. DeWitt testified, based upon his experience with a store in the K-Mart Plaza, that a store in one of the strip centers in that area was exposed to the same volume of traffic as a store in the Northern Lights Mall.[11] It is possible that, upon a trial on the merits, plaintiff will be able to establish that a store in Northern Lights is exposed to a larger volume of traffic than a store in one of the strip centers or that the amount of business done by an optical store in Northern Lights is greater than that generated by a retail outlet in a strip center. However, this will not necessarily establish the unreasonableness of the restraint involved here. The extent of the disparity between the amount of traffic passing by or business done at the different locations will have to be considered.

■ Moreover, the exclusivity clause in DeWitt's lease will properly be regarded as an unreasonable restraint of trade only if this provision has an adverse impact on competitive conditions as they exist generally in the field of commerce in which plaintiff is engaged. *Gough v. Rossmoor Corp., supra*, 585 F.2d at 386. Thus, the significance of the competition eliminated must be viewed in the context of the total competition extant in the relevant market. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 615, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Associated Press v. United States*, 326 U.S. 1, 27, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (Frankfurter, J., concurring); *American Motor Inns, Inc. v. Holiday Inns, Inc., supra*, 521 F.2d at 1247; 1 J. Von Kalinowski, *supra*, § 6.02[4][a].

■ According to Mr. DeWitt (and there is no evidence to the contrary), there are nine or ten retail optical stores competing in the northern part of the Greater Syracuse Metropolitan Area.[12] In addition, Mr. Ransom acknowledged that the retail sale of optical goods is a highly competitive business. It seems doubtful to the Court, in view of the prevailing market conditions, that the elimination of one retail outlet would have a significant competitive impact.[13] It has frequently been stated that the "antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors*' . . . ." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (Emphasis in original). See also *Gough v. Rossmoor Corp., supra*, 585 F.2d at 386; *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 134 (2d Cir. 1978).

The type of exclusivity clause involved in this case should also be considered. The provision in question provides:

Landlord agrees that after the date of execution of this lease, Landlord will not execute any new leases or renew any existing leases for any other optical store in the shopping center or mall, or any

---

11. Mr. Ransom testified that the volume of traffic passing by Northern Lights was significant, but when asked by plaintiff's counsel to compare the amount of traffic going by Northern Lights with that on Route 11, he was unable to do so because of his lack of familiarity with the area.

12. There are perhaps thirty or more optical stores in the Greater Syracuse Metropolitan Area.

13. Of course, when a *per se* violation of the Sherman Act has been established, the applicability of the antitrust laws is not affected by the fact that only one competitor has been eliminated, *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra*, but the Court has previously indicated that a *per se* approach is not appropriate here. Also, it should be pointed out that Optivision is not being completely eliminated as a competitor. It has another retail outlet in the market area—a small store adjacent to its factory in Liverpool. Moreover, Optivision has four other stores in the Greater Syracuse Metropolitan Area.

other adjacent building owned, operated or managed by Landlord, or any other such building owned or operated by Landlord situated within three blocks of the premises leased herein, except in the event that the shopping center is expanded to add a third department store, in which case one more optical store could be added, but Tenant shall have first right of refusal on the leasing of such additional store. Landlord states that he has not made or renewed any lease of any other optical store as of date of this agreement.

This clause does not exclude competition from the Northern Lights Mall under all circumstances since an additional optical store will be permitted if a third department store is added. However, the potential effect of this portion of the clause is limited by the fact that DeWitt is given the first right of refusal on the leasing of such additional store.

 Another factor that should be considered is whether there is an economic justification for the exclusivity clause in his case. As previously noted, it is possible that high rentals in a regional mall such as Northern Lights would make it necessary for the landlord to provide a particular type of specialty store with an exclusivity provision in order to attract it as a tenant. Mr. DeWitt testified that he would not have entered into a lease for the rental of space in Northern Lights if he knew that another optical store would be present in the mall. He indicated that other shopping centers provide optical stores with protection similar in nature to that provided by the clause in question here.[14] On the other hand, it is not known whether any other specialty stores in Northern Lights have exclusivity provisions in their leases,[15] although it appears that at least some of them do not, since the mall contains a number of shoe stores and several stores specializing in women's fashions. If an exclusivity provision is necessary to attract an optical store, such a clause has a beneficial impact on competition that will have to be considered along with any adverse competitive effects. On the basis of the present record, the Court is unwilling to reach a conclusion concerning the economic necessity for the exclusivity provision here. However, the fact that a particular restraint does not provide an affirmative benefit to competition does not necessarily mean that the activity violates § 1, provided that the harm to competition is not significant. See *Gough v. Rossmoor Corp., supra,* 585 F.2d at 389.

The Court concludes that plaintiff has not shown a probability of successfully demonstrating, at a trial on the merits, that the exclusivity clause in DeWitt's lease violates § 1 of the Sherman Act. It is unlikely that Optivision will be able to establish the applicability of the *per se* doctrine or be able to prove that the restraint in question violates the rule of reason. In finding that the complained of conduct is probably not an unreasonable restraint of trade, the Court places particular emphasis upon the facts that there are numerous alternate locations, which are suitable for a retail optical store, and that substantial competition remains in the relevant market despite the enforcement of this clause. The Court also questions whether plaintiff has raised sufficiently serious issues concerning the validity under § 1 of the present exclusivity clause to make them a fair ground for litigation, but it is unnecessary to decide definitely whether the issues raised are of such doubt and magnitude since (as will be discussed

14. Mr. DeWitt stated that other shopping centers will not put in a second optical store until there are two or three department stores. He said that his lease at Penn Can Mall does not contain an exclusivity clause, but does provide him with the first right of refusal if a second optical store is to be opened there. It is also noted that there is an exclusivity clause in Optivision's lease although Optivision states that, if it is allowed to remain at Northern Lights, it would not seek to enforce this provision.

15. Mr. Rosenberg testified that he was not aware of exclusivity clauses in any other leases at Northern Lights, but he also said that he was not responsible for negotiating provisions of that nature. Such negotiations are apparently conducted directly by the landlord.

later) it is clear that the balance of hardships does not tip decidedly in plaintiff's favor.

### D.

Optivision also alleges that the exclusivity clause in DeWitt's lease violates § 2 of the Sherman Act as a combination or conspiracy to monopolize trade or commerce.

An essential element of a conspiracy to monopolize is proof of specific intent to monopolize the designated segment of commerce. *Bowen v. New York News, Inc., supra,* 522 F.2d at 1258; *Lewis v. Pennington,* 400 F.2d 806, 811 (6th Cir.), *cert. denied,* 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968); L. Sullivan, *supra,* § 49. The present record does not contain evidence from which the Court could find the existence of such a specific intent on part of the defendants. Of course, the requisite intent may be proved by circumstantial evidence in an appropriate case, 2 J. Von Kalinowski, *supra,* § 9.02[5], but the Court does not believe that the existence of an agreement between the landlord and DeWitt to exclude other retail optical stores from one specific shopping center is sufficient, by itself, to show an intent to monopolize the relevant segment of commerce.[16]

Moreover, there is no indication that defendants have the power to control the market for the retail sale of optical

goods in the northern part of the Greater Syracuse Metropolitan Area, but, rather, there appears to be vigorous competition among a number of different competitors which have stores in that region. Of course, a claim of conspiracy to monopolize does not require a showing of power to exclude competition, *American Tobacco Co. v. United States,* 328 U.S. 781, 789, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), but the absence of any serious likelihood of successfully achieving monopolization is evidence that can be used to support a finding of lack of specific intent. *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., supra,* 510 F.2d at 1144.

The Court concludes that, with respect to plaintiff's § 2 claim,[17] Optivision has demonstrated neither a probability of success on the merits nor sufficiently serious questions going to the merits to make them a fair ground for litigation.

### E.

Another claim asserted by Optivision is that the exclusivity clause in DeWitt's lease violates the New York State Donnelly Act. New York General Business Law § 340.[18] The Donnelly Act was modeled after the Sherman Act, and, therefore, the mode of analysis utilized under the state statute is similar to that developed under the federal legislation. *State v. Mo-*

---

**16.** In view of the vigorous competition in the relevant market and the lack of any other evidence of specific intent, the Court is also unwilling to infer specific intent on the part of DeWitt from the fact that DeWitt, in addition to securing an exclusivity clause in its Northern Lights lease, has received assurance of the first right of refusal on the leasing of a second optical store in Penn Can Mall.

**17.** From the wording of the § 2 claim in the Complaint, it is possible that plaintiff may be alleging that defendants' conduct constitutes attempted monopolization as well as a conspiracy to monopolize, but a letter sent by plaintiff's counsel to the Court after the hearing appears to disclaim this theory. In any event, the Court's discussion of the failure to establish proof of a conspiracy to monopolize shows that the two essential elements of an attempt to monopolize—specific intent to build a monopoly and dangerous probability of success—have

not been demonstrated in this case. See *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48 (2d Cir. 1979); *Bowen v. New York News, Inc., supra,* 522 F.2d at 1252 n. 7.

**18.** The Court has pendent jurisdiction over this claim and the other causes of action arising under New York State law. While plaintiff has not made a sufficient showing on the merits to be entitled to preliminary injunctive relief on the federal antitrust claims, those claims are not properly characterized as wholly insubstantial or patently frivolous. Therefore, the federal causes of action form a sufficient basis upon which to predicate pendent jurisdiction over the state claims. See *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 n. 3 (2d Cir. 1977).

bil Oil Corp., 38 N.Y.2d 460, 463, 381 N.Y. S.2d 426, 428, 344 N.E.2d 357, 359 (1976); *Hsing Chow v. Union Central Life Insurance Co.,* 457 F.Supp. 1303, 1308 (E.D.N.Y. 1978). Only those agreements which constitute unreasonable restraints of trade are prohibited under the Donnelly Act. *Dawn to Dusk, Ltd. v. Frank Brunckhorst Co.,* 23 A.D.2d 780, 258 N.Y.S.2d 746, 748 (2d Dept. 1965); *Triple D & E, Inc. v. Van Buren,* 72 Misc.2d 569, 339 N.Y.S.2d 821, 830 (S.Ct. Nassau Co.1972), *aff'd,* 42 A.D.2d 841, 346 N.Y.S.2d 737 (2d Dept.1973); *Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd.,* 64 Misc.2d 894, 315 N.Y.S.2d 897, 905 (S.Ct. Westchester Co.1970), *aff'd,* 36 A.D.2d 582, 318 N.Y.S.2d 924 (2d Dept.1971). In *Peoples Savings Bank v. County Dollar Corp.,* 43 A.D.2d 327, 351 N.Y.S.2d 157 (2d Dept.), *aff'd,* 35 N.Y.2d 836, 362 N.Y.S.2d 864, 321 N.E.2d 784 (1974), an exclusivity clause in a shopping center lease was upheld under the rule of reason. In doing so, the court emphasized the existence of alternate locations where the excluded merchant could do business:

> Not all agreements which restrain trade are proscribed by statute (General Business Law, § 340). The test is whether the restraint is unreasonable (*Dawn to Dusk, Ltd. v. Brunckhorst Co.,* 23 A.D.2d 780, 258 N.Y.S.2d 746). The City of Yonkers is the fourth largest city in the State of New York, with a population in excess of 200,000. The Cross County Shopping Center is but a small part of the City of Yonkers and there are many other locations within that city where Seamen's can locate a branch without violating the restrictive covenant in question. Indeed (and this was conceded on the argument of the appeal), there are sites on Central Avenue, only a short distance from the Cross County Shopping Center, but just outside of the restricted area, upon which Seamen's can locate a branch bank. Clearly, therefore, the covenant under review, limited as it is to the lessor's holdings in a small area, is a reasonable restriction.

351 N.Y.S.2d at 161. With respect to the present case, it has been shown that there are numerous alternate sites for the location of a retail optical store in the relevant market area, and, therefore, the restraint in question would probably be regarded as a reasonable one under the Donnelly Act.

Thus, plaintiff has not established a probability of success on the merits with regard to its Donnelly Act claim, and it is questionable whether sufficiently serious issues going to the merits have been raised to make them a fair ground for litigation.

## II.

In addition to arguing that the exclusivity clause in DeWitt's lease violates federal and state antitrust laws, Optivision maintains that, under controlling legal or equitable principles of New York State law, it should be regarded as having properly exercised the option to renew its Northern Lights lease for the five-year period following February 28, 1979.

Under New York law, notice exercising an option is legally effective only if given within the specified time and in the designated manner. *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.,* 42 N.Y.2d 392, 396, 397 N.Y.S.2d 958, 960, 366 N.E.2d 1313, 1315 (1977); *Sy Jack Realty Co. v. Pergament Syosset Corp.,* 27 N.Y.2d 449, 452, 318 N.Y.S.2d 720, 721, 267 N.E.2d 462, 463 (1971); *Goldberg v. Himlyn,* 121 Misc. 580, 201 N.Y.S. 837, 841 (Kings Co.Ct.1923); 34 N.Y. Jur., *Landlord and Tenant* § 419 (1964); 1A *Corbin on Contracts* § 264 (1963). However, the New York courts will relieve a tenant from the forfeiture of a valuable leasehold resulting from the tenant's failure to exercise his renewal option in a timely manner if his failure to do so was the result of an honest mistake or similar excusable fault, provided that the landlord will not be prejudiced by the late renewal. *Sy Jack Realty Co. v. Pergament Syosset Corp.,* supra; *Jones v. Gianferante,* 305 N.Y. 135, 111 N.E.2d 419 (1953); *Rizzo v. Morrison Motors, Inc.,* 29 A.D.2d 912, 289 N.Y.S.2d 903 (4th Dept.1968); *Gallagher v. Marconi,* 68 Misc.2d 319, 326 N.Y.S.2d 697 (Dist.Ct.Suffolk Co.1971); *Gordon v. Barash,* 67 Misc.2d

764, 325 N.Y.S.2d 213 (Civil Ct.N.Y.C.1971). This doctrine has been applied where the failure to renew by the designated date was due to an ambiguity in the lease, *Jones v. Gianferante, supra; Rizzo v. Morrison Motors, Inc., supra; Ringelheim v. Karsch,* 112 N.Y.S.2d 130 (S.Ct.Kings Co.1952); *Application of Topp,* 81 N.Y.S.2d 344 (S.Ct.Queens Co.1948), or was due to the tenant's reliance upon the actions of a third party. *Sy Jack Realty Co. v. Pergament Syosset Corp., supra* (reliance upon the United States Postal Service to deliver mail); *Eva Donut Shop, Inc. v. Pace,* 54 A.D.2d 575, 387 N.Y.S.2d 139 (2d Dept.1976) (reliance upon assignor to renew the lease). In *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc., supra,* the New York Court of Appeals extended this principle to a situation where the failure to make a timely renewal was due to the tenant's own negligence or inadvertence. See also *Blake Service Center v. J.C.R. Realty Corp.,* 59 A.D.2d 931, 399 N.Y.S.2d 444 (2d Dept. 1977); *George W. Millar & Co. v. Wolf Sales & Service Corp.,* 65 Misc.2d 585, 318 N.Y.S.2d 24 (Civil Ct.N.Y.C.1971).

In addition, the New York courts have found, in appropriate circumstances, that a landlord had waived strict compliance with the notice requirements of a renewal option or was equitably estopped from mandating strict adherence to the terms of such a provision. *Modlin v. Town & Country Tux, Inc.,* 42 A.D.2d 586, 344 N.Y.S.2d 703 (2d Dept.1973); *Adelman v. Applefield,* 22 Misc.2d 95, 203 N.Y.S.2d 602 (Mun.Ct.N.Y.C.1959).

The evidence received in the present case establishes that Optivision did not provide notice of the exercise of its renewal option to Syracuse Associates at 17 Court Street, Buffalo, New York either in person or by certified mail prior to August 31, 1978. Thus, it is clear that notice has not been given in accordance with the terms of the lease between Optivision and Syracuse Associates.

However, a more detailed consideration of the evidence is necessary to determine whether there is an equitable basis for finding that Optivision has properly renewed its lease. Sharply conflicting testimony was received on certain crucial questions, and, therefore, the resolution of this matter requires the Court to make a careful assessment of the witnesses' credibility.

In early August, 1978, Mr. Ransom and Mr. Carter met with Mr. Rosenberg in a trailer, used by Mr. Rosenberg as an office at the Northern Lights Shopping Center, to discuss the options available to Optivision for leasing space at Northern Lights. Mr. Ransom and Mr. Carter both testified that Mr. Ransom informed Mr. Rosenberg, at that time, of Optivision's decision to exercise the renewal provision of its lease, and thereby keep its store location in the mall. Mr. Ransom further said, that shortly after the meeting, he sent a letter to Mr. Rosenberg, confirming the substance of the conversation. Defendants dispute plaintiff's account of what was said at the early August meeting. Mr. Rosenberg testified that he was not informed, at that time, of a decision by Optivision, but, rather, was told by the Optivision representatives that they would get back to him later. Also, Mr. Rosenberg denied receiving any letters concerning exercise of the renewal option by Optivision.

After carefully considering all the testimony, as well as the documentary evidence before it, the Court concludes, for purposes of the present proceeding, that Mr. Rosenberg's account of the August meeting was essentially correct, and that the Optivision representatives did not tell Mr. Rosenberg, at that time, that they intended to exercise the renewal option. In particular, the Court notes that this conclusion is supported by the language used in the letter written by Mr. Ransom after the August meeting. The letter, dated August 15, 1978, states, in pertinent part:

Thanks for the discussion with us of our options regarding our space in Northern Lights. We have decided to renew our lease and remain where we are. I think you will be pleased with the total renovation of our store that we plan.

Please, therefore, consider this letter notice of our formal renewal of our lease

in the Northern Lights Shopping Center for a period of five years, commencing at the expiration of the initial term of our lease, February 28, 1979.

The foregoing language suggests that Optivision intended to inform the landlord of its decision to exercise the renewal option by means of that letter, and that it was not merely confirming a decision it had previously informed the landlord of.

The Court also observes that, immediately after the meeting with Mr. Rosenberg, Mr. Carter and Mr. Ransom (while riding in an automobile) had a discussion concerning the alternate courses of action which were open to Optivision, and it is likely that a decision with respect to the exercise of the renewal option was not made prior to this conversation.

The parties have argued, at considerable length, as to whether plaintiff has adequately proven whether the August 15, 1978 letter, signed by Mr. Ransom, was actually mailed. However, the Court feels that, in the present posture of this case, it is unnecessary to resolve that question.[19] The Court finds that, even if the letter was mailed, it was not received by either Mr. Rosenberg or by Syracuse Associates. The letter was addressed:

Mr. Irving Rosenberg
Syracuse Shopping Center Associates
Northern Lights Shopping Center
North Syracuse, NY 13202

This address is improper. While the management of Northern Lights regularly receives mail at its offices in the shopping center, such mail is addressed to International Business & Realty Corporation or simply to Northern Lights Shopping Center rather than to Syracuse Shopping Center Associates. As previously indicated, Syracuse Associates have their offices at 17 Court Street, Buffalo, New York. Also, the proper zip code for the Northern Lights Mall was not used in the above address, and Mr. Ransom acknowledged that it was quite possible that there was no return address on the envelope. Of course, there is no presumption that an incorrectly addressed letter was duly received, cf. *Nassau Insurance Co. v. Murray,* 46 N.Y.2d 828, 414 N.Y.S.2d 117, 386 N.E.2d 1085 (1978), and the Court accepts Mr. Rosenberg's testimony that the letter signed by Mr. Ransom was not received by himself or by Syracuse Associates.

The Court concludes that the landlord did not receive notice (oral or written) of Optivision's intention to exercise the option in its lease until October, 1978. Evidently, Optivision became aware of the exclusivity clause in DeWitt's lease sometime during the fall of 1978, and then decided to find out if anything was wrong with the purported renewal of its own lease. Optivision representatives contacted Mr. Rosenberg in October, 1978, concerning this matter,[20] and were advised by Mr. Rosenberg that he had not received a letter from them, and were told to contact Mr. Weinstein in Buffalo. For purposes of deciding the present motion, it is particularly significant that the landlord did not receive notice of Optivision's decision to renew its lease until after the signing of the lease between the landlord and DeWitt on September 6, 1978 which was also after the August 31, 1978 contractual deadline. The Court finds that the landlord entered into the arrangement with DeWitt in the good faith belief that Optivision had not exercised its option. While the negotiations with Mr. DeWitt, for the rental space in Northern Lights, began before August 31, 1978, the terms of the lease, including the exclusivity clause, were not agreed upon until after that date. It appears that the landlord would be liable in damages to DeWitt for breach of the exclusivity clause if Optivision is allowed to re-

---

**19.** At the time of the hearing, the Court reserved decision on the admissibility of Mr. Ransom's letter of August 15, 1978. The Court now rules that the letter is admissible to establish the propositions discussed in the text.

**20.** There is a conflict in the testimony as to whether the contact in October, 1978 between Optivision representatives and Mr. Rosenberg was in person or by telephone, but it is unnecessary to resolve this conflict.

main in Northern Lights.[21] Hence, the landlord changed its position before learning of Optivision's decision on renewal. Because of the prejudice, which the landlord would suffer by giving effect to Optivision's late renewal, this case is distinguishable from the previously cited cases in which the New York courts granted equitable relief to tenants who exercised options to renew in an untimely manner.

■■■ Contrary to the suggestion made by Optivision, the landlord was under no duty to advise the tenant that the time for exercising the renewal provision had passed. In certain limited circumstances (i. e., when renewal is automatic, New York Gen.Oblig.L. § 5–905), a landlord is required to advise a tenant of the contents of a renewal clause, but the Court is not aware of any statutory provision that is applicable here. The principle that a landlord is not required to give notice to a tenant of the renewal clause in its lease is supported by the New York Court of Appeals' decision in *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc., supra.* In that case, the landlord, throughout the term of the leasehold, regularly informed the tenant of its obligations under the lease, but did not advise it of the time limitation on the exercise of the renewal option. Nonetheless, the court, in remanding the case for a new trial, said that the tenant would not be entitled to relief if the landlord, relying on the agreement had, in good faith, made other commitments before receiving notice from the tenant of its decision on renewal.

■■■ Moreover, there is no basis for finding a waiver or an estoppel under the facts appearing in the present record. The Court determines that the landlord did not take any actions which would show that it did not expect strict compliance with the requirements of the renewal provision nor did it take any actions that should have caused Optivision to believe that its lease had been properly renewed. The record reveals that a letter, dated September 28, 1978, was sent

by Mr. Rosenberg to Optivision, concerning the Shopping Center's "Mall Sign Criteria" that were to be followed in the installation of exterior signs, but this was a form letter sent to all tenants at Northern Lights, and in any event, Optivision did not take any action in reliance upon it. Prior to receipt of the "Mall Sign Criteria" letter, Optivision entered into a contract with the Garfield Construction Company for the making of permanent renovations to its Northern Lights store, but it failed to obtain the landlord's approval for the making of such improvements, as is required by terms of the lease between Optivision and Syracuse Associates.

Accordingly, the Court concludes that plaintiff has failed to demonstrate a probability of success on the merits with respect to its claim that it should be regarded as having properly exercised its renewal option under legal or equitable principles of New York law. However, because of the difficult credibility questions involved, the Court does find that Optivision has raised sufficiently serious questions going to the merits to make them a fair ground for litigation.

### III.

■■■ Plaintiff also asserts a cause of action for alleged tortious interference by DeWitt with the contractual relations between Optivision and Syracuse Associates. An action for tortious interference with a party's contractual relations will lie only if there is a valid contract between the plaintiff and another; the defendant has knowledge of the contract; the defendant intentionally procures the breach of that contract; and damages are suffered. *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956); *Bryce v. Wilde,* 39 A.D.2d 291, 333 N.Y.S.2d 614, 616 (3d Dept.), *aff'd,* 31 N.Y.2d 882, 340 N.Y.S.2d 185, 292 N.E.2d 320 (1972); *Welch v. Campbell,* 197 Misc. 165, 94 N.Y.S.2d 860, 864 (S.Ct.Otsego Co.1950), *aff'd,* 278 App.

---

**21.** This is based upon the assumption that the exclusivity clause itself is valid. If the provision were found to be invalid, DeWitt presumably would not be able to collect any damages for its breach.

Div. 605, 102 N.Y.S.2d 51 (3d Dept.1951). On the other hand, interference with pre-contractual relations is actionable where a contract would have been entered into had it not been for the malicious, fraudulent, or deceitful actions of a third party. *A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 376, 165 N.Y.S.2d 475, 481, 144 N.E.2d 371, 375 (1957); *Susskind v. Ipco Hospital Supply Corp.,* 49 A.D.2d 915, 373 N.Y.S.2d 627, 629 (2d Dept.1975); *Franklin Enterprises Corp. v. King Refrigerator Corp.,* 207 Misc. 956, 141 N.Y.S.2d 734, 736 (S.Ct.Queens Co. 1955). The "would have been entered into" standard is a strict one as it is more stringent than "being reasonably certain" or "having a reasonable expectation." *Union Car Advertising Co. v. Collier,* 263 N.Y. 386, 401, 189 N.E. 463, 469–70 (1934); *DeSantis v. City of Troy,* 83 Misc.2d 195, 371 N.Y.S.2d 310, 316 (S.Ct.Rensselaer Co.1975).

The evidence considered earlier shows that plaintiff did not properly exercise its renewal option, and, therefore, there does not exist a valid lease agreement between Optivision and the Syracuse Associates for the five-year period after February 29, 1979. Since there is not a valid contract in existence, a claim for tortious interference with contractual relations is not viable. Even if a valid lease renewal had been effected, there is no showing that DeWitt had knowledge of that. In addition, a claim for tortious interference with pre-contractual relations will not lie since there is no showing that DeWitt engaged in malicious, fraudulent, or deceitful actions. Rather, it appears that DeWitt had a legitimate business motivation in seeking an exclusivity clause. Also, it is questionable whether the contract (new lease agreement) would necessarily have been entered into if it had not been for DeWitt's actions in negotiating an exclusivity clause. While the record shows that the landlord would have evidently been willing to negotiate with Optivision con-cerning a new lease agreement if the exclusivity provision had not been included in DeWitt's lease, it is not absolutely clear that the negotiations would have been successfully concluded since a new rental amount would have to have been agreed upon.[22]

The Court concludes that, with respect to a claim for tortious interference with contractual or pre-contractual relations, plaintiff has not established either a probability of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation.

## IV.

■ The Court has found that plaintiff has not demonstrated a probability of success on any of the causes of action it has asserted, but even if a likelihood of success were shown on one or more claims, Optivision's motion for a preliminary injunction would have to be denied because of its failure to demonstrate irreparable harm. Optivision's principal claim of harm is that it will lose a valuable business asset—the location of its Northern Lights store and the good will of the customers who patronize that retail outlet. However, this claim is essentially one for lost profits. It appears that, if plaintiff prevails at trial, it will be possible to compute, with a reasonable degree of certainty, the damages it will suffer. In fact, at the hearing, Mr. Ransom was able to predict the approximate annual dollar volume of sales that Optivision would expect to receive under the conditions then prevailing at the Northern Lights Shopping Center. The ability to compute monetary damages establishes that the harm which plaintiff would suffer is not irreparable in nature. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, at 72 (2d Cir. 1979); *Triebwasser & Katz v. American*

---

**22.** The causation requirement for tortious interference with pre-contractual relations appears to be more stringent than the causation requirement under the antitrust laws. *See* section I.A. of the text *supra.* Thus, it is quite possible that there might be a sufficient causal relationship between the activity in question and the asserted injury to establish antitrust standing even though there is not a sufficient degree of certainty that plaintiff would have received the contract to establish the tort of intentionally interfering with pre-contractual relations.

*Telephone & Telegraph Co.*, 535 F.2d 1356, 1359–60 (2d Cir. 1976); *SCM Corp. v. Xerox Corp., supra,* 507 F.2d at 363; *American Brands, Inc. v. Playgirl, Inc.*, 498 F.2d 947, 949–50 (2d Cir. 1974).

 A threat that a party will be driven out of business if a preliminary injunction is not granted may constitute irreparable harm, *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28–29 (2d Cir. 1978); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970), but there is no evidence that the plaintiff here would suffer such consequences. In addition to its Northern Lights store, Optivision has a number of other retail outlets in New York State and Georgia. The continued operation of Optivision as a corporate entity does not appear to be threatened.

 Also, loss of customer good will may constitute irreparable harm where a distributor is deprived totally of the opportunity to sell an entire line of merchandise, *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc., supra,* 588 F.2d at 29; *Jacobson & Co. v. Armstrong Cork Co., supra,* 548 F.2d at 444–45; *Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir. 1969), but that is not the situation here. Optivision will continue to be able to provide its customers with a full line of optical goods at locations other than the Northern Lights Shopping Center.

As previously indicated, plaintiff has shown, with respect to at least one of its causes of action, sufficiently serious questions going to the merits to make them a fair ground for litigation. However, because of its failure to demonstrate irreparable harm, plaintiff has failed to satisfy the second test of the Second Circuit preliminary injunction standard as well as the first. See *State of New York v. Nuclear Regulatory Commission, supra,* 550 F.2d at 750; *Triebwasser & Katz v. American Telephone & Telegraph Co., supra,* 535 F.2d at 1359. The second test is not satisfied here for the further reason that the balance of hardships does not tip decidedly in plaintiff's favor. If a preliminary injunction is not granted, Optivision will suffer a loss of profits by not being able to do business in the Northern Lights Shopping Center and will have to pay a small amount of damages to the Garfield Construction Company,[23] but if a preliminary injunction is granted, the Syracuse Associates will lose the higher rentals that could be obtained by leasing Optivision's store site to another tenant and will lose the opportunity to obtain a different kind of tenant (perhaps a type of store not already represented in the mall) who might make the shopping center a more attractive place to shop. Also, the granting of an injunction will cause DeWitt to experience lost sales and correspondingly, lost profits.[24] It cannot be said that the balance tips sharply in plaintiff's favor.[25]

Accordingly, plaintiff's motion for a preliminary injunction is denied.

It is so ordered.

---

**23.** The contract with Garfield Construction Company is for $17,502, of which $2,000 constitutes a down payment and $5,000 represents work already commenced. Thus, Optivision's liability to Garfield will be $7,000 plus the construction company's profit margin.

**24.** The landlord would probably be liable to DeWitt for such lost profits if the validity of the exclusivity clause were upheld and an injunction were issued solely on the state law claims.

**25.** Defendants contend that since Optivision's lease, as well as the one to which DeWitt is a party, contains an exclusivity clause, the doctrines of unclean hands and *in pari delicto* require the motion for a preliminary injunction to be denied. It is unnecessary to consider the extent to which these doctrines might be relevant to a motion for preliminary injunctive relief since the Court has determined that an exclusivity clause, in the circumstances presented here, is probably not unlawful.