**DALMO SALES CO., Inc., et al.,**
**Plaintiffs,**

v.

**TYSONS CORNER REGIONAL SHOP-**
**PING CENTER et al., Defendants.**

**Civ. A. No. 2129-69.**

United States District Court
District of Columbia.

Jan. 2, 1970.

Hollabaugh & Jacobs, Marcus A. Hollabaugh, Douglas V. Rigler, John F. Graybeal, Washington, D. C., for plaintiffs.

George Cochran Doub, H. Max Ammerman, Washington, D. C., for Tysons Corner.

Christopher H. Buckley, Jr., James C. McKay, for May Dept. and Hecht Co.

George W. Wise, Washington, D. C., for Woodward & Lothrop.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

PRATT, District Judge.

Upon consideration of plaintiffs' Motion for Preliminary Injunction, Memorandum, Supplemental Memorandum, Affidavits, Depositions and testimony in support thereof; defendants' Oppositions, Memoranda, Affidavits, Deposition and testimony in support thereof; and oral argument of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Plaintiffs have filed this suit pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1964), seeking treble damages, preliminary and permanent injunctive relief against the defendants. The gravamen of the claim is that plaintiffs have been prevented from leasing store space at Tysons Corner Regional Shopping Center as a result of joint action by the defendants amounting to a group boycott violative of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1964). Although certain allegations of the complaint have been admitted, violations of the Sherman Act have been denied.

2. The plaintiffs, hereinafter collectively referred to as "Dalmo," are six affiliated corporations which own and operate retail stores in the District of Columbia and in the states of Virginia and Maryland, and a seventh corporation, Tyco Appliance and T.V., Inc. ("Tyco"), a Virginia corporation established for the purpose of entering into a lease of store space in the Tysons Corner Shopping Center located in Fairfax County, Virginia. Dalmo principally engages in the retail sale of consumer durable electrical appliances and television sets. The conduct of its business involves receipt of goods shipped in interstate commerce.

The defendant Tysons Corner Regional Shopping Center ("Tysons Corner") is a general partnership, engaged in the business of developing and operating a large shopping center at Tysons Corner, Virginia.

The defendant The May Department Stores Company ("May Company") is a New York corporation engaged in the operation of The Hecht Co. stores ("Hecht Co.") in the greater Washington area, including a store at Tysons Corner. The defendant The Hecht Company is a Maryland corporation existing solely for the purpose of protecting the trade name "The Hecht Co." "Hecht Co." hereinafter refers collectively to Hecht Co. and May Co.

The defendant Woodward & Lothrop, Incorporated ("Woodward") is a District of Columbia corporation engaged in the operation of Woodward & Lothrop stores in the greater Washington area, including a store at Tysons Corner.

The defendant City Stores Company is a Delaware corporation engaged in the operation of Lansburgh's stores ("Lansburgh's") in the greater Washington area, including a store at Tysons Corner.

3. The complaint was filed on July 29, 1969. Shortly thereafter, a temporary restraining order was entered by Judge Waddy of this Court enjoining Tysons Corner from leasing to another tenant certain specifically designated space in the shopping center pending hearing and determination of plaintiffs' motion for a preliminary injunction. It was agreed by Dalmo and Tysons Corner that the restraining order should remain in effect until disposition of plaintiffs' motion.

Plaintiffs deposed the partner of Tysons Corner principally responsible for the development of the center, Theodore N. Lerner, and Tysons Corner's leasing agent, Joseph C. Glenn, which two individuals were responsible for negotiating leases with prospective shopping center tenants, and for conducting the transactions between Tysons Corner and plaintiffs. Plaintiffs also have deposed the president of the Hecht Co., Edward H. Selonick, and Woodward's vice president of real estate, Nathaniel J. Orleans. Testimony of Dalmo's presi-

dent, Stephen H. Baumgarten, was obtained by deposition taken by defendants Tysons Corner and Woodward & Lothrop. Numerous documents were produced for examination by plaintiffs of which more than 150 were made a part of the record in the course of the depositions.

Although the temporary restraining order and preliminary injunction motions were filed by plaintiffs against all defendants, the restraining order was entered only as to defendant Tysons Corner. At the hearing on the motion for a preliminary injunction, counsel for plaintiffs agreed to withdraw the motion as to all defendants except Tysons Corner.

4. The activities leading to the development of Tysons Corner began in 1961. In order to obtain the financial commitments from large department stores necessary to support a center such as Tysons Corner, negotiations were initiated with Hecht Co. and Woodward in 1962 and 1963 and culminated in 1965. Commitments from these stores, or others of a similar nature, were considered to be an essential prerequisite by Tysons Corner for future leases from smaller stores, both because of the need of "outside" financing and because of the "drawing power" of large stores. Hecht Co. and Woodward negotiated as a block with Tysons Corner pursuant to a "gentlemen's agreement" between them. Representatives of Tysons Corner and the two stores were present at most of the negotiating sessions.

5. On December 7, 1965, Tysons Corner executed a lease with Hecht Co. Final approval by Hecht Co. was conditioned upon execution of an identical lease by Tysons Corner with Woodward. A lease substantially identical to Hecht Co.'s was executed by Woodward on December 21, 1965. These leases committed the two stores to rental commitments of a minimum of $500,000 per year, over a minimum period of 30 years. The terms of these essentially identical leases were negotiated jointly by the three parties.

6. In May, 1968, City Stores entered into a substantially identical lease with Tysons Corner for a Lansburgh's Store at Tysons Corner. This lease was entered into as a result of the successful prosecution of an action filed in this Court by City Stores in which it contended that Tysons Corner had granted it an option for a lease. Issues pertaining to the federal antitrust laws were neither raised nor decided in that action.

7. Section 31.3 of the Hecht Co. and Woodward leases contains provisions granting each store the power to veto any prospective tenant of Tysons Corner which was not among the 465 stores on an approved list (Exhibit M of the Leases). This provision reads as follows:

"As respects any building, buildings and/or improvements or any part or parts thereof or any storeroom or storerooms therein located more than one hundred twenty-five (125) feet from the Enclosed Mall facade(s) of the Tenant Principal Building, *all Center Leases entered into for the occupancy of thirty thousand (30,000) square feet or less of floor area shall be subject to the previous approval of Tenant of the identity of the Person(s)*, which approval shall not be unreasonably withheld, provided, however, that by the execution of this Lease Tenant approves the identity of the Person(s) enumerated in Part I of Exhibit M hereof." (Emphasis added).

This provision was jointly negotiated by Hecht Co., Woodward and Tysons Corner. During these negotiations some amendments were made to the approved list (Exhibit M).

8. During the negotiations, Woodward raised the question as to whether the approval rights proposed in the leases were overly restrictive. Thereafter, Woodward executed its lease containing such approved rights in the form originally proposed.

9. The list of approved stores contains the names of 465 stores and includes a wide variety of different types of stores carrying almost every conceiva-

ble type of merchandise. At no time was Dalmo proposed for inclusion on the list and, as a consequence, it was never vetoed from the list.

10. After the execution of the leases with Hecht Co. and Woodward and as the development of Tysons Corner progressed, Tysons Corner requested from Hecht Co. and Woodward approval of each new tenant not already on the approved list. Approximately one-half of the specialty stores now in Tysons Corner were not on the approved list and received the required approval from the department stores. Two stores were not approved. One, a restaurant, was disapproved by Hecht Co. A second restaurant was also disapproved by Hecht Co. because "after personal inspection we do not feel this operation is good for either the Center or for The Hecht Co." This second restaurant was eventually admitted as a tenant because of other considerations. The second disapproved ten-

ant, Dalmo, was vetoed by both Hecht Co. and Woodward. The principal managing partner of Tysons Corner, Mr. Lerner, and the leasing director, Mr. Glenn, felt that the disapproval by any one of the three department stores was sufficient to block entry of a prospective tenant.

11. Dalmo commenced negotiations with Tysons Corner in May, 1968. In December, 1968, Tysons Corner submitted a form lease with an addendum to Dalmo.[1] Subsequent negotiations between Tysons Corner and Dalmo concerned the removal of the word "discount" from all Dalmo advertising. Representatives of Tysons Corner viewed Dalmo as somewhat below the quality of other stores at Tysons Corner and stated that changes in Dalmo's advertising policy might render it acceptable to the three department stores. Tysons Corner submitted to Dalmo an addendum containing such changes.[2] On February 19,

---

1. The first sentence of Paragraph I of Article Sixteen of this form lease provided:

   Tenant shall not operate or conduct in the demised premises a type of business currently known in the commercial field as a "discount store" or a "Bargain store" similar to a "Korvette" or other type of discount store, nor shall Tenant operate or conduct a business continuously selling, or offering or purporting or holding itself out to sell, merchandise or services at "discount" or "Bargain" prices.

   The first paragraph of the Addendum to this form lease provided:

   In addition to the provisions of Article Sixteen of the attached lease, Tenant covenants and agrees that with reference to all of the Dalmo stores in the Metropolitan Washington Area, it shall not include in its advertising, logo, or name, the word "discount" or any reference to a discount operation. Tenant further agrees that it shall have the word "discount" removed immediately from all of its signs at other locations in the Metropolitan-Washington Area.

   The third paragraph of the Addendum provided:

   This lease is subject to the Landlord's being able to obtain such approvals, governmental and others, as may be re-

quired for the use of the premises as an appliance store.

2. The second proposed addendum submitted by Tysons Corner to Dalmo included the following provisions:

   (11) Modifying the provisions of Article Sixteen, paragraph I., the first sentence shall be deleted. The following sentence shall be inserted in its place: "Tenant shall not include in any of its advertising that makes specific reference to the demised premises or to Tysons Corner Center or on any signs or other material on the demised premises, any advertising or reference to the effect that Tenant shall continually sell or offer merchandise for sale at bargain prices. Tenant further agrees that it shall not use the word 'discount' or make any reference to a discount operation in any such advertising or on any such signs or other material. Tenant may, however, advertise sales from time to time, as are incidental to an ordinary retail business."

   (20) Tenant covenants and agrees that neither it nor any of the "Dalmo" entities operating in the Metropolitan-Washington area shall refer to "Tyco" or to the demised premises when advertising "Dalmo" locations. All advertising relating to the demised prem-

1969, Dalmo responded by submitting to Tysons Corner a lease incorporating in amended form the provisions requiring certain changes in its advertising previously proposed by Tysons Corner.[3] On February 21, 1969, Tysons Corner sent identical letters to the three department stores requesting approval of the proposed tenant, Dalmo. These letters included an explanation of the proposed revision in Dalmo's policy of discount advertising.

12. After receiving the Tysons Corner letter, Mr. Selonick of the Hecht Co. visited Dalmo Stores. He stated that he "found them dirty, the salesmen were dirty, the 'signing' in the windows were huge and I could not envision this kind of operation on the mall at Tysons Corner." On February 27, 1969, Hecht Co. sent a letter to Tysons Corner disapproving of Dalmo. Previously, on February 8, 1968, Mr. Selonick had sent a disapproval letter to Tysons Corner concerning another prospective tenant, a restaurant, in which he stated after personal inspection, "we do not feel this operation is good for either the Center or for the Hecht Company."

13. Woodward responded to the February 21 letter by requesting a copy of the addendum to the proposed Dalmo lease which concerned discount advertising. Mr. Orleans of Woodward stated this request was made to gain time to discuss the matter with his superiors. On March 11, 1969, Woodward wrote Tysons Corner that it disapproved of Dalmo stating that Dalmo "was not in keeping with the character of the Center as it was conceived and as it currently exists." Mr. Orleans, who wrote this letter, was unaware at that time that

---

ises shall not contain any reference to "Dalmo" or to other "Dalmo" locations.

3. The lease finally submitted by Dalmo to Tysons Corner contained slight amendments to the Tysons Corner proposals as follows:

(11) Modifying the provisions of Article Sixteen, paragraph I., the first sentence shall be deleted.

(20) Tenant covenants and agrees that with reference to all of the Dalmo stores in the Metropolitan-Washington area, it shall not include in any of its advertising or on any signs or other material in its stores, any advertising or reference to the effect that it continually sells or offers merchandise for sale at bargain prices. Tenant further agrees that it shall not use the word 'discount' or make any reference to a discount operation in any such advertising or on any such signs or other material. Tenant may, however, advertise sales from time to time, as are incidental to an ordinary retail business. Tenant further agrees that it shall have the word 'discount' removed immediately from all of its signs at other locations in the Metropolitan-Washington area.

(21) Tenant may, at its option, during the term of this Lease, after 30 days written notice to Landlord, change its trade name at the demised premises to TYCO APPLIANCES AND T.V., INC. which trade name shall then be used by Tenant throughout the remainder of the term hereof and Tenant shall not use or trade under or advertise itself under any other name, style or designation. If Tenant should elect to make this trade name change then the whole of addendum (20) shall be deleted and become null and void and the following two paragraphs shall be substituted in its place:

Tenant shall not include in any of its advertising that makes specific reference to the demised premises or to Tysons Corner Center or on any signs or other material on the demised premises, any advertising or reference to the effect that Tenant shall continually sell or offer merchandise for sale at bargain prices. Tenant further agrees that it shall not use the word 'discount' or make any reference to a discount operation in any such advertising or on any such signs or other material. Tenant may, however, advertise sales from time to time, as are incidental to an ordinary retail business.

Tenant further covenants and agrees that neither it nor any of the "Dalmo" entities operating in the Metropolitan-Washington area shall refer to "Tyco" or to the demised premises when advertising "Dalmo" locations. All advertising relating to the demised premises shall not contain any reference to "Dalmo" or to other "Dalmo" locations.

Hecht Co. had already disapproved Dalmo.

14. Lansburgh's made no response to Tysons Corner's letter. According to its lease, as well as those of Hecht Co. and Woodward, this failure to disapprove amounted to an automatic approval of Dalmo.

15. Approximately one or two months after Hecht Co. disapproved Dalmo, Mr. Lerner of Tysons Corner telephoned Mr. Selonick of Hecht Co. and told him either that Woodward had reconsidered and was willing to withdraw its disapproval of Dalmo or that Woodward was reconsidering its disapproval. Lerner requested that the Hecht Co. withdraw its disapproval of Dalmo. Mr. Selonick then telephoned Mr. Hoffman of Woodward because he doubted the accuracy of the information Mr. Lerner had given him. Upon being asked whether Woodward had withdrawn or was considering withdrawing its disapproval of Dalmo, Mr. Hoffman is reported as having said "At this point, I don't remember who Dalmo is." Selonick did not discuss approval of Dalmo with Lansburgh's.

16. On June 5, 1969, Tysons Corner entered into a lease with Sun Radio, a store engaged in discount selling operations. That lease was not disapproved by Woodward, Hecht Co. or Lansburgh's. The final lease with Sun Radio contains the provisions against sales at discount or bargain prices and discount advertising which apparently are in all the form leases at Tysons Corner.[4]

17. Evidence proffered by plaintiffs at a subsequent hearing on December 9, 1969, shows that leases executed by three other large Washington area shopping centers with Hecht Co. and Woodward contain provisions preventing the landlord from leasing to discount stores or houses. These leases were executed between 1957 and 1959. Another lease between Woodward and Iverson Mall of February 9, 1966 prohibits the landlord from leasing to second-hand or surplus stores or discount houses. Leases involving five other shopping centers and Woodward, and/or Hecht Co. contain no such restrictions barring discount houses. Of these five leases, four contain approval rights similar to those embodied in the Tysons Corner leases. Four of these five leases were executed after 1963, the other in 1954. All nine of the above leases are still in effect.

18. Hecht Co., Woodward and other stores at Tysons Corner sell household appliances and other merchandise similar to that sold by Dalmo, and compete with each other and with Dalmo in the sale of such merchandise. Hecht Co., Woodward and other stores at Tysons Corner, to a certain but undefined extent, sell such merchandise at less than the manufacturers' suggested retail prices.

19. The evidence is in conflict as to the specific reasons for the disapproval of Dalmo by Hecht Co. and Woodward. Evidence presented by Dalmo that its policy of discount pricing and discount advertising is the real basis for its being disapproved is countered by the evidence of Tysons Corner, Hecht Co. and Woodward that Dalmo, because of the nature and quality of its operations in its six stores, did not fit into the "fashion image" which Tysons Corner and the department stores there located purportedly seek to promote.

*Conclusions of Law*

1. This court has jurisdiction to entertain this action. It has personal jurisdiction over the parties and the subject matter of the controversy concerns interstate commerce.

2. Plaintiffs have failed to meet their burden of showing a substantial likelihood or, at least, a reasonable probability that they will prevail at trial on the merits, a showing requisite to the issuance of a preliminary injunction. A Quaker Action Group v. Hickel, 421 F.2d

---

4. See Section 16, Paragraph I of the form lease, *supra*, note 1.

1111(D.C.Cir. June 24, 1969); see Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958).

The evidence on the present record is in conflict as to the motive and purpose of the department stores in excluding Dalmo from the Tysons Corner Center. At trial, defendants may well be able to demonstrate their contention that Dalmo was excluded because the shopping center and the department stores, all with a heavy financial stake in the success of the enterprise, concluded that Dalmo was not the type of store which would promote the image of fashion and quality desired for the Tysons Corner development. As an example, the record shows that the president of the Hecht Co. visited a Dalmo store and entertained the same doubts about the acceptability of Dalmo as a tenant that he had previously expressed about a restaurant which was not a Hecht Co. competitor. In addition, discount prices or sales below list price were offered by the department store defendants as well as certain of the satellite stores at the Center. Such practices would seem to indicate that discount pricing alone was not a controlling consideration. Under these circumstances, it is doubtful whether the plaintiffs can show that the exclusion of Dalmo from Tysons Corner pursuant to the lease provisions constituted a group boycott *per se* violative of the antitrust laws.

■ Group boycotts held by the Supreme Court to fall within the category of *per se* illegality have, with the possible exception of Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), involved significant anticompetitive motives. *See* Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); United States v. General Motors Corp., 384 U.S. 127, 147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *cf.* Associated Press v. United States, 326 U.S. 1, 16, 65 S.Ct. 1416, 89 L.Ed. 2013 (1944); Fashion Originators' Guild of America v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 611, 34 S. Ct. 951, 58 L.Ed. 1490 (1914); S. Chesterfield Oppenheim & Glen E. Weston, Federal Antitrust Laws 530 (3rd ed. 1968). Where there is absence of an anticompetitive motive, or where the anticompetitive motive is not clearly demonstrable, the legality of a group boycott under the Sherman Act may very well be subject to test under the rule of reason. United States v. Insurance Board of Cleveland, 188 F.Supp. 949 (N.D.Ohio 1960); Coons, Non-Commercial Purpose As A Sherman Act Defense, 56 Nw. U.L.Rev. 705, 752 (1962); *see* Young v. Motion Picture Ass'n of America, Inc., 112 U.S.App.D.C. 35, 299 F.2d 119 (1962), cert. denied, 370 U.S. 922, 82 S.Ct. 1565, 8 L.Ed.2d 504 (1962). Specifically, the rule of reason may be applicable to boycotts involving competitors where the motives for exclusion are not directly profit related. Coons, *supra*, 56 Nw.U.L.Rev. at 752, 755; *cf.* Savon Gas Stations Number Six, Inc. v. Shell Oil Co., 309 F.2d 306, 309–310 (4th Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963).

■ 3. The presence of novel legal issues, which require resolution at trial, preclude the grant of a preliminary injunction. Instant Delivery Corp. v. City Stores Co. et al., 284 F.Supp. 941 (E.D. Pa.1968). In this case, it is clear that the successful development of Tysons Corner or any similar regional shopping center is dependent on obtaining the prior long term commitments of large department stores. The commitments are necessary for at least two reasons: (1) to attract the financial backing of a lending institution to construct the shopping center, and (2) to attract the variety of smaller stores dependent on the consumer traffic generated by the department stores. The heavy financial stake of Tysons Corner and the department stores which are parties to long-term leases in the future success of such an enterprise may very well give them

the right to select and approve tenants who in their judgment will contribute to the success of the enterprise without being subject to the *per se* rule of illegality applied to group boycotts and concerted refusals to deal under the Sherman Act. Certainly, Tysons Corner as the lessor has the right to refuse to lease to any tenant and has the right to grant a single tenant the exclusive right to conduct a particular type of business. See *Savon, supra.* Any restraint involved in the sharing by Tysons Corner of such rights with the department stores whose prior commitments are necessary to the success of the enterprise may very well be deemed to be a reasonable one under the antitrust laws. In any event, the legal question appears to be a novel one since the parties have not been able to cite, nor have we been able to find, any case bearing upon this precise question.

4. Plaintiffs have not established an intent to monopolize by the defendants or the existence of monopoly power in the relevant market. This court cannot conclude that a substantial likelihood exists that plaintiffs will establish these essential elements of their monopolization claim at trial.

5. Although plaintiffs' request for a preliminary injunction must be denied, the interests of justice require preservation of the injunction pending appeal, which plaintiffs have indicated they plan promptly to take. Since a temporary restraining order has been in effect since August, 1969, the parties would not be unduly inconvenienced by a further extension of the *status quo.* Also, plaintiffs would incur irreparable injury if defendants were allowed to rent the space now the subject of the restraining order and if plaintiffs were ultimately to prevail on appeal. This court, in its discretion, will therefore enter an order pursuant to Rule 62(c), Fed.R.Civ.P., granting an injunction for ninety (90) days from the date of this order or until disposition of the case upon summary hearing, whichever occurs first.