**NET REALTY HOLDING TRUST,**
Plaintiff,

v.

**FRANCONIA PROPERTIES, INC., et al., Defendants.**

Civ. A. No. 82–0318–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

Aug. 10, 1982.

Andrew P. Miller, Alexandria, Va., for plaintiff Net Realty Holding Trust.

John S. Stump, Alexandria, Va., for defendants Franconia Properties and Riklis.

Warwick R. Furr, II, Vienna, Va., for defendant J. C. Penney Co.

Francis A. McDermott, Fairfax, Va., for defendant Montgomery Ward.

John Keith, Fairfax, Va., for defendant ASC of Springfield, Inc.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

Plaintiff Net Realty Holding Trust (Net) is a Massachusetts real estate trust. Net has filed an action in this court challenging the validity of an affirmative use restriction affecting a store area that it purchased in Springfield Mall. This restrictive covenant requires the occupants of three large areas in the shopping mall to operate first-class department stores for a period of thirty years. Net's store is one of the restricted areas.

The plaintiff essentially attacks the restrictive covenant on two grounds. First, Net contends that the covenant violates both the Sherman Act and the Virginia Antitrust Act. See 15 U.S.C. §§ 1, 2 (1976 & Supp. IV 1980); Va.Code §§ 59.1–9.5, –9.6 (1982). Second, the plaintiff asserts that the restriction is not binding, because performance of it is impossible. The court has jurisdiction over the antitrust claims under both federal-question and diversity statutes. See 28 U.S.C. §§ 1331, 1332(a), 1337 (1976 & Supp. IV 1980). The pendent claim doctrine provides jurisdiction over the state impossibility claim. See United Mine Workers v. Gibbs, 383 U.S. 715, 729, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966).

The plaintiff now moves for partial summary judgment. See Fed.R.Civ.P. 56(a). It asks the court to declare the covenant invalid on both antitrust and impossibility grounds. In addition, defendant ASC of Springfield, Inc. (ASC) moves the court to dismiss it from the suit. See id. 12(b)(6).

## I. FACTUAL BACKGROUND

Springfield Mall is a regional shopping center located in Fairfax County, Virginia. On October 1, 1970, the mall's developer and its three major occupants entered into an Easement and Operating Agreement (EOA). The developer was Arlen of Virginia, Inc. (Arlen). The three major occupants initially were J. C. Penney (Penney), Montgomery Ward & Co. (Ward), and Kaufman-Straus Co. (K–S). These occupants all purchased large store areas in the mall.

Under the EOA, each major occupant promised to operate its store area as a first-class department store under its trade name for a thirty-year period. See EOA § 9.2. The agreement prohibits a major occupant from subdividing more than twenty percent of its floor space during this time period. See id. § 9.4(i). The EOA describes itself as a covenant running with the land. See id. §§ 29.3, 29.15. A party transferring its store area, however, does not escape its obligations under the agreement, unless the transferee expressly agrees to assume the obligations. See id. §§ 18.1–18.2. The EOA does excuse a party from performance if uncontrollable circumstances render performance impossible. See id. § 14.

On April 5, 1973, the parties to the EOA entered into an Easement and Operating Agreement Amendment (EOAA). The EOAA substituted ASC as a major occupant in place of K–S and Franconia Associates (Franconia) as the developer in place of Arlen. See EOAA §§ 4(A), 15. ASC prom-

ised to operate a Korvette store and to assume all of its predecessor's obligations. *See id.* § 4(A)(1), (C), (D). The parties have made no further amendments to the EOA.

On September 1, 1976, ASC transferred fee ownership of its store area to Net. Korvette's, Inc. continued leasing the space. On September 5, 1980, Korvette abandoned its lease with Net. On July 16, 1981, Korvette filed for bankruptcy.

On April 8, 1982, Net filed this action in federal court. Its complaint contains four counts. The first count asks for a declaratory judgment that the continuous operation provision (COP) of the EOA is unenforceable against Net on four grounds: (1) the COP violates the monopolization and restraint-of-trade provisions of the Sherman Act and the Virginia Antitrust Act; (2) the COP does not run with the land; (3) the COP does not bind Net, because Net qualifies as a mortgagee in possession; and (4) performance of the COP is impossible due to Korvette's abandonment of the lease. *See* 28 U.S.C. §§ 2201–2202 (1976). The second count requests an injunction against enforcement of the COP and damages on the ground that the defendants have contracted and combined to restrain interstate trade in violation of section 1 of the Sherman Act. *See* 15 U.S.C. §§ 1, 15, 26 (1976 & Supp. IV 1980). The third count demands the same relief based on monopolization in violation of section 2 of the Sherman Act. *See id.* § 2 (1976). The last count is a parallel state antitrust claim. The defendants in this action are Penney, Ward, ASC, and the two partners in Franconia.

ASC now moves the court to dismiss it from the suit, because it is no longer a party to the EOA. The defendant argues that status as a major occupant runs with the land. Thus, it lost that status when it transferred ownership of its store area to Net. ASC asserts that it no longer has any interest in the EOA or any power to enforce it. It, therefore, should not be a party to this action. Net responds that the EOAA still lists ASC as a party to the agreement. The plaintiff argues that, as a consequence, ASC is a proper defendant.

ASC also argues that any antitrust action against it is barred by the applicable four-year statute of limitations. *See* 15 U.S.C. § 15b (1976); Va.Code § 59.1–9.14 (1982). It alleges that its interest in the EOA terminated in 1976 when it transferred the land to Net. Net counters with the assertion that its cause of action did not accrue until Korvette abandoned the lease in 1980.

Net asks for summary judgment on two parts of its complaint. First, Net moves for an injunction prohibiting enforcement of the COP against it on the ground that the COP violates the restraint-of-trade provisions of the Sherman Act and the Virginia Antitrust Act. *See* 15 U.S.C. § 1 (Supp. IV 1980); Va.Code § 59.1–9.5 (1982). Second, the plaintiff asks for a declaratory judgment that the COP is not binding on it under Virginia law, because performance is impossible.

## II. LEGAL ANALYSIS

Before the court can decide the antitrust and impossibility issues in this case, it first must determine the state-law rights and obligations of the various parties under the EOA and EOAA. A convenient time for making this determination is in the course of resolving ASC's motion to dismiss. The court, therefore, will deal with ASC's motion before deciding Net's partial summary judgment motion.

### A. ASC's Motion to Dismiss

ASC relies on two arguments in its motion to dismiss. First, it asks the court to dismiss all claims for declaratory and injunctive relief against it on the ground that it no longer has any right to enforce the EOA against Net. Second, ASC contends that the applicable four-year statute of limitations bars all claims against it for damages under federal and state antitrust law. *See* 15 U.S.C. § 15b (1976); Va.Code § 59.-1–9.14 (1982).

The defendant first argues that the transfer of its store area to Net on September 1, 1976, divested it of any right to enforce the EOA after that date. The EOA

as amended by the EOAA, however, still lists ASC as a party, because the parties to the agreement never changed it to reflect the sale to Net. The validity of the first argument, therefore, depends on how the transfer affected ASC's rights under the EOA. An examination of the mechanics of the COP is necessary before the court can answer this question.

The heart of the COP is section 9.2 of the EOA. This section requires each of the mall's three major occupants to operate a first-class department store under its trade name for a period of thirty years. *See* EOA § 9.2.[1] The store operation must occupy at least two-thirds of each occupant's floor area. *See id.* A provision clearly related to section 9.2 is section 9.4(i). This provision prohibits a major occupant from subdividing more than twenty percent of its floor area. *See id.* § 9.4(i).[2] The combination of sections 9.2 and 9.4(i) creates a restrictive covenant with both an affirmative and a negative component. The affirmative component imposes a positive duty to operate a designated first-class department store. The negative component prohibits an occupant from using more than twenty percent of its floor area for anything except operation of the designated store.

Section 29.3 of the EOA provides that all covenants in the EOA "are intended to be and shall be construed as covenants running with the land, binding upon, inuring to the benefit of and enforceable by the parties hereto and their successors and assigns in the manner set forth herein." *Id.* § 29.3. *See also id.* § 29.15. A restrictive covenant such as the COP runs with the land only if the following three conditions are met: (1) the covenant must touch or concern the land; (2) there must have been privity of estate between the covenantor and the covenantee at the time that they entered into the agreement; and (3) the parties must intend that the covenant run with the land. *See Raintree Corp. v. Rowe,* 38 N.C.App. 664, 248 S.E.2d 904, 908 (1978); 20 Am.Jur. *Covenants* § 30 (1965). The COP meets all three of these requirements.[3] First, a covenant limiting use of land clearly touches or concerns the restricted land. *See id.* § 167. Second, there was privity of estate in this case, because the original major occupants purchased their parcels at the

---

1. Section 9.2 provides in relevant part:

    So long as (i) Developer shall not be in default under this section 9, (ii) Occupants of at least 200,000 square feet of Floor Area of the Mall Stores shall be conducting business, and (iii) Occupants of at least two of the other Major Stores are conducting business, each Major Occupant shall: (x) for a period of 20 years after the Opening Date continuously operate its Store ... as a first class department store occupying at least two-thirds of the Floor Area specified in section 3 under a name including "Penney", "Ward" or "Lansburgh's", as the case may be, unless the name of all of such Major Occupant's stores in the Washington Metropolitan Area is changed, in which event the Store of such Major Occupant may be operated under the name as changed; and (y) thereafter, for an additional period of 10 years, continuously operate or cause to be so operated its Store ... as a first class department store....

    EOA § 9.2. The EOAA substituted "Korvette's" for the term "Lansburgh's" in section 9.2. *See* EOAA § 4(A)(2).

2. Section 9.4 states:

    Notwithstanding anything to the contrary herein contained, each Major Occupant may: (i) lease portions of its Store or license departments therein or grant concessions to Subtenants for the sale of merchandise or services therein; *provided, however,* that Subtenants in the Store of any Major Occupant shall not occupy in the aggregate more than 20% of the Floor Area in such Store;

    ....

    *See* EOA § 9.4. The EOAA did not modify section 9.4(i).

3. Both the affirmative and negative components of the COP meet the three requirements for running with the land. Most state courts do not draw a distinction between affirmative and negative covenants in determining whether they run with the land. *See* 20 Am.Jur. *Covenants* § 37 (1965). In a few states, however, an affirmative covenant cannot attach to the land. *See id.* The Virginia courts have not spoken to this issue. Even if Virginia were to join the minority, the negative portion of the COP would still run with the land. Thus, the COP, at a minimum, would preclude Net from subdividing its store or using it for any purpose other than the operation of a first class department store. If Virginia were to follow the majority rule, the plaintiff also would have an affirmative duty to operate a Korvette's store.

same time that they entered into the EOA. Finally, the language of section 29.3 indicates that the parties intended the COP to run with the land.

■ The provisions of section 18 do not affect the court's conclusion that the COP runs with the land. Section 18.1 declares that a sale by a major occupant of its store area does not release that occupant from any of its obligations under the EOA, "until after the termination of such party's obligations under section 9." EOA § 18.1. Section 18.2 further provides that an occupant transferring its parcel may terminate its EOA obligations only by submitting "to the other parties an instrument in recordable form whereby the transferee expressly assumes all of such party's obligations under this Agreement." Id. § 18.2. The plaintiff argues that sections 18.1 and 18.2 convert the COP from a covenant running with the land into a personal promise of the covenantor. These two sections, however, permit only the obligations of the former occupant to continue after transfer of its parcel. A reciprocal covenant such as the COP has both a burden and a benefit component. The fact that the burden component binds both the transferee and the transferor does not prevent the covenant from running with the land. See 20 Am.Jur. Covenants § 25 (1965).[4]

■ The court has ruled that the COP runs with the land. Two conclusions, however, are inescapable, regardless of whether this holding is correct. First, the restrictions of the COP are binding on Net if Net had notice of the COP at the time that it purchased the store area from ASC. See Shirlington Drug Store v. Shirlington Corp., 199 Va. 112, 97 S.E.2d 652, 656 (1957); Oliver v. Hewitt, 191 Va. 163, 60 S.E.2d 1, 2–3 (1950). The original parties to the EOA recorded it at the time that they purchased their tracts. In addition, the deed from ASC to Net incorporates the EOA by reference. Thus, the COP clearly is binding on Net. See also EOA § 29.15.

Second, the benefit component of the COP passes with ASC's store area, as long as the original parties to the EOA intended it to run with the land. See 20 Am.Jur. Covenants § 34 (1965). The COP definitely meets this requirement. See EOA §§ 29.3, 29.15. ASC's entire bundle of rights under the EOA, therefore, passed to Net upon the sale of the store area to Net.[5] This bundle of rights included the right to enforce the COP. As a consequence, ASC has not had any power to enforce the COP since September 1, 1976. The court accordingly will dismiss all claims against this defendant for declaratory and injunctive relief.

The fact that ASC has not had any power to enforce the COP against Net since transferring its parcel also disposes of the antitrust damages claims against it. ASC could not have damaged the plaintiff, because it has never had the power to restrict the plaintiff's use of the store area. In addition, the applicable four-year statute of limitations would bar any claim for antitrust damages arising from the sale transaction itself. See 15 U.S.C. § 15b (1976); Va.Code § 59.1–9.14 (1982).[6] The court, therefore, dismisses ASC from this suit.

4. In a typical covenant running with the land, the burden component binds both the original covenantor and the person who currently owns the burdened parcel. See 20 Am.Jur. Covenants § 25 (1965). The original covenantor may escape his obligations only by obtaining a release from all interested parties. The benefit component, however, attaches strictly to the benefitted parcel. See id. § 21. The current owner alone has the right to enforce the benefit component. See id. The EOA follows this pattern closely. See EOA §§ 18.1, 18.2, 29.3, 29.15.

5. ASC has never obtained a release from its obligations under the COP. It, therefore, may still owe duties to the other parties to the EOA. See EOA §§ 18.1, 18.2. The potential existence of such duties, however, has no bearing on the claims brought by Net.

6. Net contends that the four-year limitations period on its damages claim against ASC has not yet expired. It argues that the running of the limitations period was tolled until Korvette abandoned the lease, because the amount of damages was not ascertainable until that time. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338–42, 91 S.Ct. 795, 806–808, 28 L.Ed.2d 77 (1971). This argument misses the mark. If ASC has caused any antitrust injury to Net, it did so at the time that it

## B. Net's Motion for Partial Summary Judgment

Net moves for declaratory and injunctive relief on two grounds. First, it argues that the COP is illegal, because it violates the restraint-of-trade provisions of both the Sherman Act and the Virginia Antitrust Act. *See* 15 U.S.C. § 1 (Supp. IV 1980); Va.Code § 59.1–9.5 (1982). Second, the plaintiff asserts that the COP is unenforceable, because Korvette's bankruptcy has made performance of the COP impossible. The court will consider each of these contentions in turn.

### 1. The Restraint-of-Trade Claim

Section 1 of the Sherman Act prohibits all agreements "in restraint of trade." 15 U.S.C. § 1 (Supp. IV 1980). If read literally, this provision would proscribe all business agreements, because every contract restrains trade to a certain extent. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918); *Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. 665, 674 (N.D.N.Y.1979). The Supreme Court recognized long ago that Congress did not intend section 1 to eliminate all commercial agreements. The Court, therefore, has adopted the rule of reason as the standard for analyzing most business arrangements under this section. *See Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. at 674.

Under the rule of reason, a factfinder must analyze "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc. v. GTE Sylvania*

*Inc.*, 433 U.S. at 49, 97 S.Ct. at 2557. *See also Chicago Board of Trade v. United States*, 246 U.S. at 238, 38 S.Ct. at 243. The focus of the analysis should be the impact that the challenged practice has on competitive conditions in the relevant market. *See National Society of Professional Engineers v. United States*, 435 U.S. at 688–92, 98 S.Ct. at 1363–1365; *Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. at 675. In particular, the factfinder must balance the anticompetitive effects of the activity against any benefits to competition. *Gough v. Rossmoor Corp.*, 585 F.2d 381, 388–89 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. at 675.

While the courts generally have applied the rule of reason standard, a *per se* rule of illegality is appropriate where the challenged practice has only anticompetitive consequences. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–21, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979); *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. at 49–50, 97 S.Ct. at 2557. Some arrangements "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Under such circumstances, the court can rule immediately that the practice in question is illegal. Net contends that the court should apply the *per se* rule in this case.

Net alleges that the COP has two anticompetitive effects. The plaintiff further asserts that both of these effects stem ultimately from section 29.8 of the EOA. This section requires the written approval

---

transferred its store area to Net. Assuming that ASC did commit an antitrust violation at that time, the measure of damages would be the decrease in the value of the store area

caused by the presence of the COP. This amount was readily ascertainable at the time of the transfer. Thus, there was no tolling of the limitations period.

of each major occupant and the developer to amend the EOA. *See* EOA § 29.8. Net contends that this provision gives the parties to the EOA an absolute right to veto any proposed modification of the agreement.

The first anticompetitive effect of which Net complains arises from the limitation on subdivision imposed by section 9.4(i). The plaintiff argues that this provision prevents it and the other major occupants from competing with the developer in the leasing of space to small businesses. The antitrust aspect of this arrangement derives from the developer's power to veto any change in the subdivision restriction. This veto power gives the developer the ability to restrain the leasing trade within the mall.

The court agrees that section 29.8 gives the developer an unrestrained power to veto changes in section 9.4(i). The main purpose of the EOA is to keep three first-class department stores operating in the mall, so that the mall will remain a commercially viable unit. The subdivision restriction is an essential element of the plan to retain operating department stores.[7] The court, therefore, holds that the parties

intended to retain an absolute veto power over modifications to section 9.4(i), despite the fact that section 29.8 does not specifically grant such an absolute power. As a consequence, the developer does have the ability to restrain trade to some extent.

The next question that the court must face is the magnitude of the anticompetitive effect produced by the developer's veto power. There are three factors that tend to mitigate the effect of any veto. First, section 9.4(i) currently permits the major occupants to compete with the developer to the extent of subdividing twenty percent of their floor area. Second, the subdivision restrictions expire at the end of the thirty-year period specified in section 9.2. *See Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. at 676. Finally, the court suspects that the relevant market for measuring the effect of the developer's exclusionary power is much larger than Springfield Mall. The market probably includes all of the malls within the suburban area of northern Virginia. If this suspicion is correct, the anticompetitive effect of the developer's veto is minimal.[8]

---

7. The successful development of a regional shopping center such as the Springfield Mall requires long-term commitments from several large department stores. *See Dalmo Sales Co. v. Tysons Corner Regional Shopping Center*, 308 F.Supp. 988, 994 (D.D.C.), *aff'd*, 429 F.2d 206 (D.C.Cir.1970). Such commitments are necessary at the planning stage to attract financing for construction of the shopping center. *See* 308 F.Supp. at 994. In addition, the financial success of the smaller stores in the center will depend on the consumer traffic generated by the department stores. *See id.* Thus, the long-term presence of the large stores is necessary to attract smaller tenants.

   Once the developer has set up a functioning shopping center, each major occupant has an incentive to subdivide its store area into several smaller stores. This incentive derives from the fact that subdivision increases the per-foot rental or purchase price of a store area. If, however, all of the large stores subdivided their spaces, the mall would collapse due to the decreased flow of consumer traffic. Thus, in economic terms, a free-rider problem exists. *See* Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 Colum.L.Rev. 282, 285 (1975). *See also Continental T. V., Inc. v. GTE*

*Sylvania Inc.*, 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977). A major occupant who subdivides effectively obtains a "free ride" on the consumer traffic generated by the remaining large stores. A subdivision restriction, therefore, is necessary to prevent the collapse of the shopping center as a functioning unit.

8. The court must measure the anticompetitive effect of the developer's veto power in the context of the total competition existing in the relevant market. *See Gough v. Rossmoor Corp.*, 585 F.2d 381, 386 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. 665, 678 (N.D.N.Y.1979). The significance of the competition eliminated in this case is obviously minimal if the developer competes for tenants with all of the malls in the surrounding area. It is of little import that the developer's veto power has a significant impact on this particular plaintiff, because the plaintiff occupies only a miniscule portion of the relevant market.

   The Supreme Court's decision in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209, 79 S.Ct. 705, 707, 3 L.Ed.2d 741 (1959), appears at first glance to contradict this analysis. In that case, the Court held that a group

The second anticompetitive effect alleged by Net arises from the provision of section 9.2 that requires the plaintiff to operate a Korvette store. It is obviously impossible for Net to perform this obligation, because Korvette's, Inc. is now bankrupt. The plaintiff contends that section 29.8 gives the other major occupants an absolute power to prevent it from leasing its space to a department store other than Korvette. Net further asserts that this ability to exclude competitors qualifies as a horizontal group boycott. Such boycotts are illegal *per se* under current case law. *See United States v. General Motors Corp.*, 384 U.S. 127, 145–46, 86 S.Ct. 1321, 1330–1331, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–14, 79 S.Ct. 705, 709–710, 3 L.Ed.2d 741 (1959); *Associated Press v. United States*, 326 U.S. 1, 19–21, 65 S.Ct. 1416, 1424–1425, 89 L.Ed. 2013 (1945).

The court disagrees with Net's analysis of the interaction between sections 9.2 and 29.8. Section 14 of the EOA clearly excuses the plaintiff from its obligation to operate a store under the name of "Korvette's," because bankruptcy qualifies as a circumstance beyond the plaintiff's control. *See* EOA § 14. Net is also correct in stating that section 29.8 requires it to obtain the approval of the other parties to the EOA before bringing in a new tenant to replace Korvette. Where the plaintiff misses the mark is in claiming that the other major occupants have unfettered discretion to withhold their approval. In applying section 29.8 to the attempts to replace a major occupant, the court will read in a standard of reasonableness. *See Friedburg v. Riverpoint Building Committee*, 218 Va. 659, 239 S.E.2d 106, 112 (1977). Under this standard, a party's refusal to approve a proposed replacement tenant would be unreasonable, if that tenant qualified as a first-class department store. This construction of section 29.8 makes sense in light of the EOA's goal of keeping three such stores in operation.

The court's injection of a reasonableness standard removes Net's situation from the realm of horizontal group boycotts. This standard prevents Ward and Penney from excluding potential competitors from the mall, because it requires them to accept any first-class department store proposed by Net. The combination of sections 9.2 and 29.8, in fact, appears to stimulate competition by assuring that a department store will occupy Net's parcel throughout the thirty-year period specified by section 9.2. Thus, the plaintiff cannot invoke the *per se* rule on group boycott grounds.

The court now must determine whether there is any justification for applying a *per se* rule in this case. The current case law has firmly established only four types of restraints as *per se* unreasonable: (1) horizontal and vertical price fixing; (2) horizontal market division; (3) group boycotts; and (4) tie-in sales. *Gough v. Rossmoor Corp.*, 585 F.2d at 386. The first question that the court must face is whether either of the restraints involved in this case falls into one of the established *per se* categories. The court already has held that the restraint provided by sections 9.2 and 29.8 does not constitute a group boycott. This restraint also does not fit into any of the other categories. Finally, the court rules that the subdivision restriction does not fall into any of the established categories.

The court next must consider whether the restraints alleged by Net qualify as *per*

---

boycott by a department store and several appliance manufacturers against a small appliance store was *per se* illegal, despite the fact that the anticompetitive effect on the market as a whole was small. *See id.* 212–14, 79 S.Ct. at 709–710. The Court indicated that the small size of the business affected was irrelevant. *See id.* at 213, 79 S.Ct. at 710. The *Klor's* case, however, is distinguishable from the present controversy, because it dealt with an activity that fell into one of the firmly established categories of *per se* antitrust violations. *See Gough v. Rossmoor Corp.*, 585 F.2d at 386. A group boycott is a patently anticompetitive arrangement. In contrast, the subdivision restriction challenged here does not fall into any of the established *per se* categories. *See id.* It also has a purpose other than the stifling of competition. *See* note 7 *supra*. The rationale of *Klor's*, therefore, does not apply to the subdivision restriction.

*se* violations under a more general analysis. The general rule is that a business arrangement falls under the *per se* rule only if it has significant anticompetitive effects and no procompetitive effects. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. at 19–21, 99 S.Ct. at 1562–1563; *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. at 49–50, 97 S.Ct. at 2557; *Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. at 675. The restraints challenged here produce at least two procompetitive effects. First, they promote competition within the Springfield Mall by requiring that three department stores be in operation there at all times. Second, the restraints are responsible for the continued viability of the mall.[9] Thus, they also stimulate competition among malls. The court, therefore, refuses to apply a *per se* rule of illegality, because a balancing of the procompetitive and anticompetitive effects of the COP is necessary.[10]

A final factor that supports the court's refusal is the novelty of the issues involved in this case. The court cannot find any cases that have dealt with the type of restraints challenged here. Thus, the most prudent course for the court to take is to apply the rule of reason. *See Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. at 675–76.

The court's decision to employ the rule of reason requires it to deny the portion of Net's partial summary judgment motion based on antitrust grounds. The court needs further information based on the size and nature of the relevant market before it can make a final decision on the reasonableness of the restraints imposed by the COP. The court, however, will advise the parties of its belief as to the most likely outcome of the antitrust issue.

Common sense indicates to the court that the restrictions of the COP will ultimately prove reasonable for three reasons. First, the procompetitive effects of the restrictions appear to outweigh the anticompetitive effects. The anticompetitive effects, in fact, seem to be miniscule.

Second, the restrictions of the COP appear quite reasonable in light of shopping mall mechanics. The key to maintaining the vitality of a shopping center is the presence of several large stores. The smaller stores depend heavily on the consumer traffic generated by the large stores. *See Dalmo Sales Co. v. Tysons Corner Regional Shopping Center*, 308 F.Supp. 988, 994 (D.D.C.), *aff'd*, 429 F.2d 206 (D.C.Cir.1970). The price that the smaller stores pay for this increased consumer traffic is a higher rental or purchase price for their store space than they would pay outside of the shopping center context. The large stores, in turn, receive a discount on the cost of their store area as compensation for generating the consumer flow.

Once a shopping center is functioning, the large stores have an incentive to subdivide their spaces into smaller stores. This incentive arises from the increase in the per-foot rental or purchase price that subdivision produces. A large store that subdivides effectively obtains a "free ride" on the consumer traffic generated by the remaining major occupants. If, however, all of the large stores subdivided their spaces, the mall would collapse from lack of traffic. This market imperfection is a classic example of the free-rider problem.[11] The fact that the restrictions of the COP are necessary to remedy this imperfection is a strong reason for finding them reasonable. *See Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. at 55, 97 S.Ct. at 2560.

**9.** *See* note 7 *supra.*

**10.** The Virginia Antitrust Act does not mandate application of a *per se* rule here. The wording of the Virginia restraint-of-trade provision is virtually identical to that of its federal counterpart. *Compare* Va.Code § 59.1–9.5 (1982) *with* 15 U.S.C. § 1 (Supp. IV 1980). The state act must "be applied and construed to effectuate its general purpose in harmony with judicial interpretation of comparable federal statutory provisions." Va.Code § 59.1–9.17 (1982). The court, therefore, holds that the Virginia version of section 1 follows its federal counterpart in requiring application of the rule of reason in this case.

**11.** *See* note 7 *supra.*

Finally, a decision to permit Net to subdivide would provide it with a windfall. When Net purchased ASC's space, it paid a discounted price that reflected the restrictions placed upon the space by the COP. If the court were to remove these restrictions, Net would receive a windfall increase in the value of the space. This windfall potential militates against ruling in favor of Net on antitrust grounds. *See THI–Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 996 (9th Cir. 1980).[12] Thus, it is unlikely that Net will ultimately prevail on its antitrust claim.

### 2. The Impossibility Claim

Net's final contention on summary judgment is that performance of the COP has become impossible due to Korvette's bankruptcy. The court agrees that Korvette's financial demise has made it objectively impossible for the plaintiff to operate a department store under the trade name of "Korvette's." The doctrine of impossibility clearly relieves Net of its duty to lease its space only to a store of that name. Net, however, asserts that this impossibility of performance is a sufficient ground for declaring the whole COP unenforceable. The critical question, therefore, is whether Korvette's bankruptcy justifies striking out the entire COP or only some portion of it.

Under Virginia law, the doctrine of impossibility excuses performance only in four types of circumstances:

> [W]here impossibility is due to domestic law, to the death or illness of one who by the terms of the contract was to do an act requiring his personal performance, or to the fortuitous destruction or change in the character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance, the promisor will be excused, unless he either expressly agreed in the contract to assume the risk of performance, whether possible or not, or the impossibility was due to his fault.
>
> ... [A] fourth classification has been frequently allowed in recent years, that is, impossibility due to the failure or non-existence of a certain state of affairs or means of performance, the continued existence of which was contemplated by both parties as the basis of their contract, but not contracted for.

*Housing Authority of Bristol v. East Tennessee Light & Power Co.*, 183 Va. 64, 31 S.E.2d 273, 276 (1944) (citations omitted). *See also Virginia Iron, Coal & Coke Co. v. Graham*, 124 Va. 692, 98 S.E. 659, 662 (1919). Under this standard, it is not enough that performance has become more difficult. The Virginia courts instead require objective impossibility. *See Ballou v. Basic Construction Co.*, 407 F.2d 1137, 1140–41 (4th Cir. 1969).

▌ Section 14 of the EOA provides a custom-made definition of impossibility that supersedes the common-law test. This section excuses a party from performing any obligation under the EOA "for so long as such performance is prevented, delayed, retarded or hindered ... by ... any ... cause ... not within the reasonable control of the party prevented, delayed, retarded or hindered." EOA § 14. This definition of impossibility is more expansive than its common-law counterpart. Regardless, however, of which standard the court employs, Korvette's bankruptcy clearly excuses Net from operating a store under the designated trade name. The question that still remains is whether this impossibility invalidates the entire COP.

---

**12.** A related factor that decreases the plaintiff's chance of success is the doctrine of unclean hands. The Fourth Circuit has held that "when parties of substantially equal economic strength mutually participate in the formulation and execution of the [antitrust] scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other." *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 15–16 (4th Cir. 1971); *accord THI-Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 996 (9th Cir. 1980). Net obviously has participated in any antitrust conspiracy arising from the COP, because it acquiesced in and enjoyed the benefits of that provision for more than five years. The doctrine of unclean hands may even bar the plaintiff from receiving declaratory or injunctive relief, because of the potential for a windfall gain to the plaintiff. *See id.*

The general rule in partial impossibility cases is that the obligor still has a duty to render the part of his performance that remains practicable if that partial performance would qualify as substantial performance. *See Scott Paper Co. v. Burlington Northern Inc.*, 13 Wash.App. 341, 534 P.2d 1031, 1032 (1975); *Van Dusen Aircraft Supplies, Inc. v. Massachusetts Port Authority*, 361 Mass. 131, 279 N.E.2d 717, 722 (1972); Restatement (Second) of Contracts § 270(a) (1981). The Second Restatement of Contracts elaborates on this standard:

> If the part of the obligor's performance that is impracticable is so minor that it is still practicable for him to render substantial performance, his duty to do so is unaffected. Whether his performance would be substantial depends on the impact of the reasonable expectations of the obligee, who either has performed in full or remains liable to perform in full (§ 237). Two means of reducing this impact are significant. First, if the obligor can render a reasonable substitute performance in place of the impracticable part, he must do so under his duty of good faith in performance (§ 205), and that substitute performance will be considered in determining whether his performance would be substantial.

*Id.*, Comment b. The ultimate purpose of the EOA is to ensure the continued operation of three first-class department stores in the mall. The replacement of Korvette with another first-class store would not impact measurably on this purpose. The court, therefore, holds that operating an appropriate store under a trade name other than the one designated by the COP would qualify as substantial performance.[13] Thus, the doctrine of impossibility does not relieve Net of the portion of its performance under the COP that remains practicable.

Under the rule for partial impossibility, Net must lease its space to a first-class department store other than Korvette, because such performance is a reasonable substitute for that specified by the COP. The court, therefore, refuses to invalidate the entire COP. It, however, does grant Net's motion to the extent of deleting the requirement that the plaintiff operate its store under the name of "Korvette's."

### III.  CONCLUSION

The most sensible avenue for the parties to this litigation to follow is settlement. It is highly unlikely that Net will succeed in invalidating the COP on antitrust grounds. The plaintiff, therefore, should go about the business of finding an appropriate replacement tenant. The defendants, in turn, should stand ready to approve any prospective lessee that qualifies as a first-class department store. Further litigation on this matter will only waste the funds of both sides.

---

**13.** The second illustration under § 270 of the Second Restatement of Contracts supports this conclusion:

> 2. A contracts with B to deliver all of B's requirements of milk during the following year at B's loading platform at 200 Lincoln Street. Before A begins performance, the loading platform is accidentally destroyed by fire, but B has an equally suitable platform across the street at 201 Lincoln Street. Neither A's nor B's duties are affected, except that A is to deliver and B is to accept milk at 201 Lincoln Street.

Restatement (Second) of Contracts § 270, Comment b, Illustration 2 (1981). This example appears completely analogous to the situation in the present case.